**PERFORMANCE ABATEMENT SERVICES, INC., Plaintiff,**

v.

**GPAC, INC., Defendant.**

**No. C–C–89–227–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

April 2, 1990.

Thomas D. Myrick, Weinstein & Sturges, P.A., Charlotte, N.C., McNeill Stokes, Stephen E. Farish, Stokes Shapiro Fussell & Wedge, Atlanta, Ga., Robert A. Vanderhye,

Nixon & Vanderhye, Arlington, Va., for plaintiff.

Jack B. Blemenfeld, Wilmington, Del., Charles V. Tompkins, Jr., Kennedy Covington Lobdell & Hickman, Charlotte, N.C., Michael R. Slobasky, Harvey B. Jacobson, Jr., Fleit Jacobson Cohn Proce Holman & Stern, Washington, D.C., for defendant.

## ORDER AND MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on (1) the Plaintiff's Motion for Injunction, filed June 26, 1989, (2) the Defendant's Motion to Dismiss, Transfer or Stay, filed July 14, 1989, and (3) the Plaintiff's Motion for Sanctions Pursuant to Rule 11, filed September 27, 1989.

On January 5, 1990, this Court conducted a hearing and listened to testimony and oral argument regarding the pending Motions. In conducting the hearing, the Court intended to give both parties the opportunity fully to develop evidence and arguments regarding the pending Motions. At the hearing, Mr. Thomas Myrick and Mr. McNeill Stokes, Esquires, represented the Plaintiff. Mr. Charles V. Tompkins, Jr., Mr. Harvey B. Jacobson, Jr., and Mr. Michael R. Slobasky, Esquires, represented the Defendant.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Both parties to this action are involved in the asbestos abatement industry, which uses negative air filtration systems to remove asbestos from buildings and other structures. The Plaintiff, Performance Abatement Services, Inc. (hereafter "Performance"), is a contracting firm engaged in the business of asbestos abatement and is a major asbestos abatement contractor. Performance contracts with other parties to remove asbestos from buildings and other structures and has been using a negative air filtration system, isolation barriers, and plastic airlocks on virtually all of its asbestos removal projects performed in the United States. The Defendant, GPAC, Inc. (hereafter "GPAC"), is engaged in the business of designing, manufacturing, and selling negative air filtration systems used at asbestos abatement project sites. GPAC is the assignee of all patent rights of U.S. Letter Patent No. 4,604,111 encompassing a negative air filtration system, isolation barriers, and plastic airlocks (hereafter "the Negative Air Patent").

On March 31, 1989, the United States Patent and Trademark Office reaffirmed the validity of the Negative Air Patent. Shortly thereafter, GPAC made a mass mailing to 3,000 asbestos removal contractors. GPAC subsequently followed the mass mailing with telephone sales calls soliciting the sale of licenses under the Negative Air Patent.

On May 23, 1989, Performance filed this action seeking both a declaratory judgment that the Negative Air Patent is invalid and that Performance is not infringing the Negative Air Patent and an injunction prohibiting GPAC from initiating patent infringement litigation, from threatening such litigation, or from charging Performance with patent infringement. In essence, Performance alleged in its Complaint that GPAC had claimed that the negative air filtration system currently used by Performance infringed the Negative Air Patent, that GPAC had threatened Performance with patent infringement litigation if Performance continued to use the current negative air filtration system in its business without first purchasing a license from GPAC, and that GPAC had demanded that Performance's actual and prospective customers refuse to deal with any asbestos abatement contractor that did not own a license under the Negative Air Patent.

On June 5, 1989, GPAC filed in the United States District Court for the District of Delaware a patent infringement action (hereafter "the Delaware action") against several defendants in which GPAC alleges, among other things, that Performance conspired to infringe GPAC's Negative Air Patent.

## II. GPAC'S MOTION TO DISMISS, TRANSFER OR STAY

### A. The Parties' Contentions

In GPAC's Motion to Dismiss, Transfer or Stay, GPAC contended, among other

things, that because a case of actual controversy did not exist when Performance filed its Complaint, the Court lacked subject matter jurisdiction. GPAC argued, consequently, that the Court should dismiss Performance's Complaint. GPAC contended, alternatively, that because of the pending Delaware action filed by GPAC shortly after Performance filed this action, the Court either should transfer Performance's Complaint to Delaware or should stay Performance's declaratory judgment action pending the disposition of the Delaware action.

Performance, on the other hand, opposed GPAC's Motion to Dismiss, Transfer or Stay. Performance contended, first, that when it filed its Complaint, a case of actual controversy existed between Performance and GPAC. Performance contended, second, that because the convenience of the parties and witnesses does not favor a transfer of the case to Delaware and because GPAC has failed to meet its burden of showing that transfer of this case to Delaware is appropriate, the Court should not transfer this action to Delaware.

### B. The Applicable Law

 Under 28 U.S.C. § 2201, a court has the authority to consider a declaratory judgment action in "a case of actual controversy." 28 U.S.C. § 2201 (1982). Courts have recognized that an actual controversy must exist when the party files the declaratory judgment action. *See Jervis B. Webb Co. v. Southern Systems, Inc.,* 742 F.2d 1388, 1398 (Fed.Cir.1984); *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1217 (7th Cir.1980). An actual controversy in patent cases exists when, first, the defendant patent owner engages in conduct that creates on the part of the plaintiff a reasonable apprehension of a patent infringement suit if the plaintiff begins or continues the questioned activity and, second, the plaintiff in the declaratory judgment action actually has produced the questioned system or method or actually has prepared to produce the questioned system or method. *Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985), *cert. denied,* 479

U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986); *Jervis B. Webb Co.,* 742 F.2d at 1399. The test for determining whether the plaintiff has a reasonable apprehension of a patent infringement suit is an objective one, and a purely subjective apprehension of a patent infringement suit is insufficient to satisfy the actual controversy requirement. *Indium,* 781 F.2d at 883. The declaratory judgment plaintiff carries the burden of proving that facts exist to support the allegations of an actual controversy. *Id.; Jervis B. Webb Co.,* 742 F.2d at 1399.

Courts considering whether a declaratory judgment plaintiff had a reasonable apprehension of imminent patent infringement litigation have considered several different factors. Courts have considered the remoteness of previous patent infringement actions by the patent holder. *See Indium,* 781 F.2d at 883 (finding that previous suits in 1975 were too remote from present suit filed in May 1982 to consider in determining reasonable apprehension). Courts have considered, also, whether the correspondence between the parties merely offered to grant a license to the recipient or, instead, threatened a patent infringement action if the recipient failed to obtain a license and manifested an intent on the part of the patent holder to bring such an action. *Compare id.* (finding that letter from patent holder to potential licensee was mere offer to grant license) *and Cambridge Wire Cloth Com. v. Laitram Corp.,* 679 F.Supp. 515, 518 (D.Md.1987) (finding that letter containing summary of patent infringement suits against other parties did not constitute threat of patent infringement action against declaratory judgment plaintiff); *with Arrowhead Indus. Water Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 737–38 (Fed.Cir.1988) (finding that correspondence between patent holder's attorney and potential licensee and between patent holder's attorney and potential licensee's customer was threat to bring suit against company known to be infringing patent because correspondence demanded end of any unauthorized activity within 20 days and stated that patent holder did not hesitate to protect its rights through patent infringe-

ment litigation). Courts have considered, too, a patent holder's willingness and capacity to engage in litigation to enforce patent rights. *Arrowhead*, 846 F.2d at 737. Courts have considered, further, whether the patent holder previously had filed any actions against the declaratory judgment plaintiff. *See C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 879–82 (Fed.Cir. 1983) (finding that patent holder had filed suit in state court to enforce rights under license agreement between itself and declaratory judgment plaintiff). Courts have considered, furthermore, the relation between the parties when the plaintiff filed the declaratory judgment action. *See id.* (finding that licensor-licensee relationship existed between parties, that licensee owed royalties under license agreement to licensor, and that licensor could terminate license agreement at any time).

### C. Discussion and Analysis

■ The primary issue for the Court to resolve is whether the facts demonstrate that when Performance filed its Complaint, Performance had a reasonable apprehension that GPAC would institute a patent infringement action against Performance for its activities. In deciding this issue, the Court will examine, among other things, those factors considered by other courts: the remoteness of previous patent infringement actions by GPAC as the patent holder, GPAC's willingness and capacity to engage in litigation to enforce its patent rights, the nature of the correspondence between the parties, GPAC's history of litigating claims against Performance, and the relation between the parties when Performance filed its Complaint. The Court believes that all of these factors favor the position of GPAC that Performance did not have a reasonable apprehension of an imminent patent infringement suit.

The Court will consider, first, the remoteness of previous patent infringement actions by GPAC, GPAC's demonstrated willingness and capacity to engage in litigation to enforce its patent rights, and GPAC's history of litigating claims against Performance. When Performance filed this declaratory judgment action, GPAC previously had initiated only one patent infringement suit involving the Negative Air Patent. In June 1987, approximately twenty-three months before Performance filed this action, GPAC filed suit against Control Resource Industries, Inc. (hereafter "Control Resource"). GPAC's suit for patent infringement against Control Resource eventually settled out of court in November 1988. At the January 5, 1990 hearing, counsel for GPAC asserted that because Control Resource publicly released information indicating that it was using GPAC's Negative Air Patent, GPAC essentially was forced to file the action against Control Resource to assert its patent rights. The only other litigation involving GPAC and the Negative Air Patent before Performance filed its Complaint was brought against GPAC. No litigation, however, was pending when Performance filed its declaratory judgment action. There was no evidence establishing that GPAC ever before had filed any litigation against Performance. From these facts, the Court concludes that GPAC's previous litigation was temporally remote from Performance's declaratory judgment action and that when Performance filed this action, GPAC had not demonstrated a marked willingness and capacity to engage in patent infringement litigation since receiving the Negative Air Patent in August 1986.

Second, the nature of the correspondence between the parties does not support a finding of a reasonable apprehension by Performance of a patent infringement suit. Evidently, GPAC contacted Performance representatives by mailing in April 1989 literature containing information about the Negative Air Patent and by calling Performance on the telephone in May 1989. The literature received by Performance included a GPAC-issued press release containing the following language:

> [The March 31, 1989 ruling of the USPTO] reinforces the validity of the ... [Negative Air Patent] and clearly gives GPAC the right to begin infringement proceedings against any user of the patented negative-pressure system from the issuance of the [Negative Air P]atent in

1986 to the present. Contractors who have not been licensed by GPAC and who have been using this system for the last two years could be subject to serious potential liability."

The package of literature issued by GPAC also contained a license application and licensing information communicating the applicable license fees and GPAC references. GPAC's written correspondence with Performance specifically did not single out Performance, or any other contractor, from any other contractor in the industry. Approximately three weeks later, a GPAC sales representative made a telephone sales call to Performance soliciting the sale of a license under the Negative Air Patent. During the telephone conversation, GPAC did not claim that Performance was infringing the Negative Air Patent, did not demand that Performance purchase a license to use the Negative Air Patent, and did not threaten any possible patent infringement litigation. Both the mailing of the literature and the telephone sales call were part of a GPAC mass marketing plan directed at over 3,000 participants in the asbestos abatement industry. Based upon these facts, the Court concludes that GPAC was merely offering to sell Performance a license, rather than threatening to sue, or manifesting an intent to sue, Performance for patent infringement if Performance failed to obtain a license to use the Negative Air Patent.

Third, the relation between the parties when Performance filed the declaratory judgment action favors the position of GPAC. When Performance filed this action, the relationship between GPAC and Performance was the relationship of offeror and offeree. The situation existing between the parties was not similar to the situation between the parties in *C.R. Bard, Inc. v. Schwartz* in which a licensor-licensee relationship existed between the parties and the licensee owed royalties under a license agreement to the licensor. *See C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 879–82 (Fed.Cir.1983). In this case, Performance previously had not been GPAC's licensee, had not refused to renew a license agreement with GPAC upon the expiration of the original license's term, or did not owe GPAC royalty fees pursuant to an existing license agreement.

Although each of the factors recognized by other courts favors GPAC's position, Performance relies upon other factors to justify its contention that when it filed its declaratory judgment action, it had a reasonable apprehension of a patent infringement action. Performance relies on the rulings of two state governments requiring bidders for asbestos removal projects within those states to be licensed by GPAC, GPAC's direct mail campaign to all participants in the asbestos removal industry, including architects, engineers, school boards, and other government agencies, who were potential Performance customers, and GPAC's subsequent institution of a patent infringement action against Performance in Delaware.

The Court carefully has reviewed Performance's contentions. The Court, however, does not put great weight on any of these other factors primarily because Performance has produced no evidence establishing that it actually knew of these other factors when it filed its declaratory judgment action. The Court believes that Performance cannot attempt to justify its claimed apprehension on factors that occurred after Performance filed this action. For instance, the Court believes that Performance cannot justify its claimed apprehension on GPAC's institution of a patent infringement suit two weeks after Performance filed its action. GPAC evidently did not even know that Performance was using a negative air filtration system that possibly infringed the Negative Air Patent until Performance filed this suit. Also, one of the state governments apparently did not issue its requirement for contractors to have a license for the Negative Air Patent until June 1, 1989, nearly a week after Performance filed its declaratory judgment action.

Furthermore, GPAC has contended that Performance merely is a nominal plaintiff in this action and, therefore, that a case of actual controversy did not exist when Performance filed its Complaint. GPAC has

argued that Performance is acting on behalf of the National Insulation Abatement Contractors Association (NIAC) essentially to attack, and simultaneously to obtain an advisory opinion regarding, the validity of the Negative Air Patent. To support its contention, GPAC has offered numerous press releases and trade documents essentially characterizing this litigation as an industry effort to declare the Negative Air Patent invalid.[1] These press releases and trade documents also reveal that NIAC has established a fund to pay for Performance's attorneys' fees and actively is soliciting contributions from industry members to endow the fund.[2]

Having reviewed the entire record, the Court concludes that when Performance filed the Complaint on May 23, 1989, Performance did not have an objectively reasonable apprehension that GPAC would file a patent infringement action against it. The Court, consequently, lacks subject matter jurisdiction over this declaratory judgment action. The Court, therefore, will grant GPAC's Motion to Dismiss and will dismiss Performance's Complaint. In dismissing Performance's Complaint, the Court finds it unnecessary, and without authority, to consider or dispose of any of the other pending Motions. The Court's dismissal, however, will not leave Performance without an opportunity to litigate the validity of the Negative Air Patent because the Delaware action is still pending.

## III. ORDER OF THE COURT

NOW, THEREFORE, IT IS ORDERED that (1) GPAC's Motion to Dismiss, Transfer or Stay be, and hereby is, *GRANTED* and (2) Performance's Complaint be, and

1. The Asbestos Control Report, an asbestos abatement industry newsletter, claimed this action is "an industry effort" and reported that asbestos removal contractors had agreed at a national meeting to contribute to the NIAC legal fund.

2. The National Association of Demolition Contractors (NADC), a trade association, issued a memorandum referring to this action as having been filed "by the NIAC on behalf of one of their members" and petitioning for support as follows:

hereby is, *DISMISSED* for lack of subject matter jurisdiction.

Simultaneous with the filing of this Order and Memorandum of Decision, the Court will file a Judgment dismissing this action.

## JUDGMENT

In accordance with the Order and Memorandum of Decision filed simultaneously with this Judgment,

IT IS ORDERED, ADJUDGED, AND DECREED that (1) GPAC's Motion to Dismiss, Transfer or Stay be, and hereby is, *GRANTED;* (2) Performance's Complaint be, and hereby is, *DISMISSED* for lack of subject matter jurisdiction; and (3) each party shall bear its own costs.

It is critical that the NIAC prevail in this suit. Because of the importance of this suit, we have joined forces with NIAC; since the outcome will affect every NADC member. The executive committee of NADC urges each member to support this suit by making a contribution to the NIAC Defense Fund. Make your contribution immediately. Support NIAC now and eliminate the possibility of your own suit later.