**VALMET PAPER MACHINERY, INC., and Valmet–Charlotte, Inc., Plaintiffs,**

v.

**BELOIT CORPORATION, Defendant.**

No. 93–C–0587–C.

United States District Court, W.D. Wisconsin.

April 3, 1995.

Brian E. Butler, Madison, WI, Myron Cohen, Martin B. Pavane, William A. Alper, Robert M. Haroun, Michael C. Stuart, Cohen, Pontani, Lieberman & Pavane, New York City, for Valmet Paper Machinery, Inc., Valmet–Charlotte, Inc., Valmet, Inc.

George P. McAndrews, Steven J. Hampton, Gregory C. Schodde, D. David Hill, Thomas J. Wimbiscus, McAndrews, Held & Malloy, Ltd., Chicago, IL, for Beloit Corp.

## OPINION AND ORDER

CRABB, Chief Judge.

In this civil action, plaintiffs Valmet Paper Machinery, Inc., and Valmet–Charlotte, Inc. (collectively, Valmet) sought damages from defendant Beloit Corporation for infringement of Valmet's U.S. Patent No. 3,868,780. Valmet also sought a declaration that Beloit's U.S. Patents Nos. 5,144,758 and 5,249,372 are invalid and not infringed by Valmet's sale of a paper making machine dryer section to APM Corporation for installation at APM's New Mexico facility. Beloit counterclaimed, seeking both a declaration that Valmet's '780 patent is invalid and damages for infringement of its own '758 and '372 patents by Valmet's APM machine. Before trial, I granted Beloit's motions for partial summary judgment, finding as a matter of law that Beloit had not infringed Valmet's '780 patent and that the '780 patent had not anticipated either of Beloit's patents. (Beloit did not pursue its claim of invalidity of the '780 patent after the finding of non-infringement.)

A four-part jury trial was held in November 1994. At the conclusion of the first part, which was directed to the claimed obviousness and indefiniteness of claims 1, 2 and 3 of Beloit's '758 patent and claims 1 and 2 of its '372 patent, the jury found that none of the claims at issue was obvious, but that claim 3 of the '758 patent and claims 1 and 2 of the '372 patent were indefinite. At the conclusion of the second phase of trial, directed to the infringement of Beloit's '758 patent, the jury found that Valmet had infringed claims 1 and 2 both literally and by the doctrine of equivalents. In the third phase, which was tried to the court, I considered and rejected Valmet's contentions that

Beloit had engaged in inequitable conduct by failing to supply the United States Patent and Trademark Office with an English translation of a prior art reference cited in its applications for the '758 and '372 patents. At the final phase of trial, the jury found that Beloit would have sold its own paper making machine to APM Corporation had Valmet not infringed Beloit's '758 patent, that Beloit was entitled to $7,875,000 in lost profits, of which $1,275,000 represented lost income on working capital, and that Valmet's infringement was not willful.

Presently before the court are (1) Valmet's motion for judgment as a matter of law or for a new trial and (2) Beloit's motions for judgment as a matter of law, entry of a permanent injunction, an order declaring this to be an exceptional case entitling Beloit to attorney fees and costs, and an award of prejudgment interest.

I conclude that Valmet's motion for judgment as a matter of law or for a new trial must be denied because Valmet has failed to show either that no reasonable jury could have found as this one did or that mistakes were committed that require the granting of a new trial. I conclude that Beloit is entitled to judgment as a matter of law on the issue of indefiniteness, that it is entitled to the entry of a permanent injunction although not in precisely the form it has proposed, that it has failed to show that this is an exceptional case and that it is entitled to prejudgment interest on the total amount of the jury award from August 1, 1993 at a rate of 6%, compounded daily.

### A. *Valmet's Motion for Judgment as a Matter of Law or for a New Trial*

#### 1. *Obviousness*

■ Any party moving for judgment as a matter of law faces the daunting task of establishing that no reasonable jury could have rendered the challenged verdict. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1547–48 (Fed.Cir.1983); *see also McGill Inc. v. John Zink Co.*, 736 F.2d 666, 672 (Fed. Cir.) (to obtain reversal of judgment, movant must show that no reasonable juror could have interpreted claim so as to support find-

ing of infringement) *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). The moving party's burden is compounded in patent cases by the evidentiary requirement that a party challenging an issued patent bears the burden not only of establishing the invalidity of the patent but of doing so by clear and convincing proof. *See, e.g., American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

Undaunted, Valmet contends that no reasonable jury could have found from the trial evidence that claims 1 and 2 of Beloit's '758 patent are not invalid for obviousness. (Valmet confines its challenge to the two claims the jury found were not indefinite and for this discussion, I will do the same.) Indeed, it asserts that the claims at issue were rendered "hopelessly obvious" by its own '780 patent, read in conjunction with the European publication of Ludwig Hauser. Understanding Valmet's contention requires an understanding of the disclosures of the claims at issue.

Claim 1 of Beloit's '758 patent discloses a "single tier drying section for drying a web comprising a first plurality of drying cylinders; [and] a first plurality of vacuum rolls, each vacuum roll of said plurality of vacuum rolls being disposed below and between adjacent drying cylinders of said first plurality of drying cylinders and being disposed in close proximity thereto"; a second plurality of drying cylinders disposed downstream relative to the first plurality with its own vacuum rolls disposed above and between adjacent drying cylinders; each plurality of drying cylinders having generally horizontal axes of rotation, with the planes of the axes at different elevations. Claim 2 discloses a "single tier drying section as set forth in claim 1 wherein said plane is above said further plane." (Claim 3 discloses a single tier dryer section in which each of the vacuum rolls has a diameter less than the diameter of the dryer cylinders; claim 1 of the '372 patent discloses a dryer apparatus for drying alternate sides of a web of paper, comprising a single tier dryer section that includes, among other things, a plurality of vacuum rolls, with each roll being of smaller diameter than the drying cylinders and being disposed between and below adjacent drying cylinders and being connected to a source of partial vacuum; claim 2 is dependent on claim 1 and adds that the plurality of vacuum rolls is arranged in such a way that the web is restrained against machine and cross-machine directional shrinkage during movement around the vacuum rolls.)

Valmet contends that its Soininen '780 patent anticipated the single tier configuration of claims 1 and 2 of Beloit's '758 patent and that Hauser's publication anticipated the '758's requirement of vacuum rolls located in close proximity to adjacent dryer cylinders. Valmet argues that Fig. 6 of the Soininen patent (shown below) is disclosed by claims 1 and 2 of the '758 patent. (The large circles represent dryer cylinders, the smaller circles are guide rollers and the line represents the felt. I have added an "X" to mark the point at which the web is transferred from one plurality of cylinders to the next.)

FIG. 6

Maintaining that Beloit is bound by its own definition of a single tier drying section in its '758 patent and "cannot rewrite history in order to prevail in this litigation," Valmet asserts that any reasonable juror would have found that cylinder group A of the Fig. 6 embodiment meets the '758 definition of a "drying section having sequential rows of dryers with the axes of rotation of the dryers in each row lying in a common plane," especially in light of the concession of Beloit's expert, Edward DeCrosta, that Fig. 6 shows the web contacting each dryer in one row before engaging any dryer in the second row. Valmet argues that together with the Hauser application's disclosure of suction rolls in place of guiding rolls, Soininen discloses every element of Claims 1 and 2 of the '758 patent, since it is undisputed that persons of ordinary skill in the art of paper making machinery design would know that vacuum rolls may be substituted for suction rolls.

Valmet's attack neglects much of the extensive evidence that was before the jury from which it could have construed the term "single tier" in Beloit's '758 patent as a single *horizontally disposed* plane of dryer cylinders. The jury could have found that the Valmet '780 patent did not teach a single tier system as defined by the '758 patent but a stacked arrangement with a substantial overlay of the dryer cylinders in the vertical planes. It is true that DeCrosta admitted

that Soininen describes an arrangement that sounds like the '758 invention to the extent it describes a machine in which the web contacts each dryer in one row before engaging any dryer in the second row. However, DeCrosta also testified that in his opinion the embodiment shown in Soininen Fig. 6 was a double tier drying section: "A tier for me is a horizontal row of elements—rolls, dryers or whatever." Tr., 4–A–83. Fig. 6 shows two pluralities of dryer cylinders, each in a stacked position, rather than horizontally disposed, with the transfer point between the two stacks. Moreover, in the '780 patent specification, Soininen himself described the dryer cylinders as "frequently placed in two rows one above the other," with "the web travel[ing] along a zigzag path alternatively under the lower cylinders and over the upper cylinders." '780 pt., col 1, lines 9–12.

In contrast to the stacking configuration shown in Soininen, Beloit's '758 patent specifies the pluralities of dryer and vacuum cylinders as horizontally disposed. For example, lines 5–9, col. 8, read: "[T]he first plurality of dryer cylinders are disposed substantially horizontal in series. The second plurality of dryer cylinders are disposed substantially horizontal in series following the first plurality of dryer cylinders." All of the embodiments shown in the patent depict horizontally disposed pluralities. *See, e.g.,* Fig. 15 below.

FIG. 15

It was not unreasonable for the jury to construe the phrase "single tier" as a single horizontally disposed plane of dryer cylinders that is not made obvious by the stacked dryer cylinders shown in Fig. 6 of the Soininen '780 patent.

Although Hauser taught the idea of modifying Soininen's patented invention by adding suction rolls in close proximity to the dryer cylinders, the jury could have found reasonably that combining his teachings with Soininen's did not make the '758 invention obvious. Persons skilled in the art would not have known necessarily from the combined teachings that adding suction rollers placed in close proximity to the dryer cylinders of the convoluted configuration shown in Fig. 6 would produce an alternating single tier drying section that solved the problems of flutter and restraint in the manner Beloit's '758 and '372 patents did. The patent examiner who rejected Hauser's application was not persuaded that Hauser had disclosed any patentable invention; rather, he concluded that Hauser had merely "re-invented" the machine Beloit's employee, Goodwillie, had invented years before. Valmet's arguments of the obviousness of Hauser plus Soininen are an example of creative hindsight reconstruction of prior art references that the jury was entitled to find unconvincing.

In determining non-obviousness, the jury was obligated to view the invention claimed in Beloit's '758 patent as a whole, taking into account the differences between that invention and the one claimed in Valmet's '780 patent, the problems solved by the '758 invention, its properties and purpose. *In re Wright,* 848 F.2d 1216, 1219 (Fed.Cir.1988); *Hodosh v. Block Drug Co., Inc.,* 786 F.2d 1136, 1143 n. 5 (Fed.Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). The jury was entitled to give weight to "secondary considerations." *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966) (as indicia of obviousness, secondary considerations may have relevancy); *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1555 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984) (all evidence bearing on issue of obviousness must be considered and evaluated and secondary considerations may be the most pertinent, probative and revealing evidence available).

In this case, the jury heard evidence of the commercial success of the Beloit Bel–Champ® machine incorporating the inventions of the '372 and '758 patents; the copy of the Bel–Champ design by Valmet; and the long-felt need in the industry for a dryer section that achieved alternate side drying, minimized sheet flutter, reduced shrinkage, eliminated open draws, threaded the web automatically, transferred the web from one section to another without open draw and accommodated higher speed. In addition, the jury had evidence of the lack of commercial success obtained by the invention claimed in Valmet's '780 patent and the machine's impracticality and inefficiency. The jury was entitled to consider the extent to which these obvious disadvantages would have put off or misled other inventors. *United States v. Adams,* 383 U.S. 39, 47–48, 86 S.Ct. 708, 712–13, 15 L.Ed.2d 572 (1966)

(known disadvantages in old devices that would discourage search for new inventions may be taken into account in determining obviousness); *Gillette Co. v. S.C. Johnson & Son, Inc.,* 919 F.2d 720, 724 (Fed.Cir.1990) (closest prior art would probably have discouraged art worker from the combination claimed in patent); *Leach v. Rockwood & Co.,* 273 F.Supp. 779, 789 (W.D.Wis.1967) (fact that prior device is inoperative has bearing on what it teaches and what would be obvious in it), *aff'd,* 404 F.2d 652 (7th Cir.1968).

The jury had ample evidence that the '780 patent covered a machine requiring walls and an enormous vacuum in order to achieve its stated purpose of keeping the web in contact with the felt in those areas in which the web would be subjected to extreme centrifugal force, that it would be inordinately difficult and expensive to build the embodiment shown in Fig. 6, given its vertically arranged dryer sections and the extended draws between sections, and that the patented machine had never been built or produced commercially. Even if the arrangement were reconfigured, as Valmet suggested would have been obvious to persons skilled in the relevant art, the result would have been a dryer section with a 48 foot vertical drop over its length. Another inventor, Keith Thomas, identified "a number of operating impracticalities" of the Soininen invention in his own patent (U.S. Patent No. 4,359,827; Valmet's exh. # 105): the guide rolls tend to cause scuffing damage to the web; the capital costs are substantial because of the complexity of the system and the extra components it requires; operating costs are high; and because heat is applied to only one side of the sheet, the resulting product has different characteristics for each surface, causing printing problems when both sides of the paper are printed. Hauser himself pointed out some of the problems inherent in Soininen's invention when he submitted his own application:

> One disadvantage of this known arrangement [Soininen's '780 patent] is that despite the ... side walls and despite the high expenditure of energy for producing the vacuum, only a relatively slight vacuum can be produced in the guide rolls since a large amount of infiltrating air is drawn-in in the region of the return path of the dryer belt (from the last cylinder of the dryer group back to the first) where the dryer belt travels without the web of paper.

Valmet's exh. # 5 at 5–6. Even Valmet's former president, Matti Kankaanpaa, testified that the Soininen vacuum would be "probably too difficult to apply, especially in existing machines...." Tr., 2–B–35.

Finally, during the entire time Soininen's idea was known to Valmet, none of the company's skilled engineers saw the obviousness of the reconfiguration of Fig. 6 into the kind of horizontally disposed dryer sections disclosed in Beloit's patents. Indeed, no one in the company built on the idea Soininen disclosed in his patent. The criticisms leveled at the '780 invention and the lack of any development of the idea are strong indications that the claims in that patent did not make the successful Bel–Champ machine obvious to persons of ordinary skill in the art of paper making machinery design.

It was not error for the jury to assess Valmet's arguments of the obviousness of the invention claimed in Beloit's '758 patent as having been formulated with the benefit of hindsight afforded by Beloit's advances. *W.L. Gore,* 721 F.2d at 1553 (warning against the "insidious attraction of the siren hindsight"). The jurors acted correctly in rejecting those arguments. I conclude that Valmet has failed to show that no reasonable jury could have found in favor of Beloit on the issues of obviousness.

■ The standard for obtaining a grant of a new trial is a far less demanding one than the standard for an award of a judgment as a matter of law, but it does require a finding that the jury's verdict is against the clear weight of the evidence. *New Idea Farm Equipment Corp. v. Sperry Corp.,* 916 F.2d 1561, 1565 (Fed.Cir.1990) (citing *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 626 (Fed.Cir.1985)). A motion for a new trial is one directed to the discretion of the court, which has authority to set aside a verdict even though there is substantial evidence to support it, if left with the firm

conviction that a mistake has been committed. 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil*, § 2806 at 44, 49 (1973); *Railroad Dynamics v. A. Stucki Co.*, 727 F.2d 1506, 1512 (Fed. Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). I have no such conviction about the jury's verdict on obviousness. Therefore, I will deny Valmet's motion for a new trial on this issue.

### 2. *Trial court errors*

As a second ground for the granting of a new trial on the issue of obviousness, Valmet cites what it contends are errors made in evidentiary rulings at trial, specifically, the court's refusal to admit any evidence that Soininen had intended that the guide rolls in Fig. 6 of the '780 patent would be foraminous (perforated) and that a vacuum would be created in the space within the felt loop of the cylinder group shown in Fig. 6. The exclusion of this evidence left Valmet with no foundation for introducing a three-dimensional model of cylinder group A in Fig. 6 of the Soininen '780 patent that was intended to demonstrate how the patent would operate. Valmet takes issue with another decision as well: the exclusion of Mauri Soininen's deposition testimony and related exhibits, which it contends would have demonstrated to the jury that a person of ordinary skill in the art would have found it obvious from Valmet's '780 patent to design a single tier dryer without folding the tiers.

■ Valmet argues first that it should have been allowed to show that Soininen specified foraminous rolls for guide rolls in each of the pictured embodiments of the invention, including Fig. 6. Because this position was hotly contested at trial and is important to an evaluation of the fairness of the outcome, it merits some extended discussion.

In an opinion issued October 27, 1994, directed to Valmet's claim that Beloit had infringed Valmet's '780 patent by building and selling four Bel–Champ paper making machines, I held that Beloit was entitled to summary judgment because Valmet had failed to come forward with proof sufficient to put its claim into dispute. I held that

Beloit's Bel–Champ machines do not infringe because they do not have walls closing the open sides of the drying belt to define a closed space inside the belt in which a vacuum is arranged, as specified by the Soininen '780 patent. The Bel–Champ uses vacuum guide rollers that employ a vacuum established by extending a pipe through the end of each guide roller in such a way that one end of the pipe communicates with the space inside the guide roller and the other end communicates with a vacuum source such as a fan. At the end of each guide roller is a structure that effectively caps it. Beloit refers to this structure as a "roll head."

I interpreted the walls limitation in claim 1 of Valmet's '780 patent as requiring structures that cover the entire open sides of the drying belt as well as the sides of the guide rollers, and I found that the caps on the Bel–Champ vacuum rollers are not their equivalent if they do not enclose both spaces. I rejected Beloit's argument that the term "walls" does not include the covers over the guide rollers, holding that the second objective of Valmet's '780 patent of keeping the web and felt in mutual contact by suction could not be met without establishing a vacuum within the guide rolls. Oct. 27, 1994 opin., dkt. # 319, at 16.

In a second opinion and order entered on November 4, 1994, I held that the '780 patent did not anticipate Beloit's '372 and '758 patents. I acknowledged that the '780 patent teaches that it is preferable that the guide rollers used in Soininen's invention are foraminous, allowing the vacuum established within the walls to create a pressure differential between the interior and exterior of each roller, causing the web to be drawn by suction to the felt as the two pass around each roller. I held, however, that no reasonable reading of the '780 patent would lead to the conclusion that the guide rollers disclosed were the equivalent of the vacuum rollers shown in Beloit's '758 and '372 patents. The '780 guide rollers are passive structures from which air is evacuated indirectly because the rollers lie inside a larger area in which a vacuum is maintained, whereas the '372 and '758 vacuum rollers are active

structures from which air is evacuated directly by means of a vacuum source connected to each roller. Nov. 4, 1994 opin., dkt # 392, at 7, 11. In the Nov. 4 opinion, I had no reason to address the argument Beloit made at the start of trial that Soininen's walls limitation did not apply to Fig. 6 of the '780 patent and that Soininen did not teach the use of walls, vacuum and vacuum rolls in the embodiment shown in Fig. 6.

When Beloit objected to Valmet's exhibit nos. 168 and 169 before the trial began, I ruled that Valmet could not use either an exhibit that was colored so as to suggest that Fig. 6 of the Soininen patent incorporated vacuum rollers (exh. # 169) or introduce a mechanical model of a Soininen dryer section (exh. # 168). I held that although Soininen had stated that generally foraminous rollers were preferred, Fig. 6 showed no such guide rollers. Unlike the guide rollers shown in Figs. 2, 3, 7 and 8 of the '780 patent, the rollers in Fig. 6 carry no symbols of vacuum or transverse flow. The absence of such symbols is striking in a patent in which the draftsman took such obvious care to depict the rolls in other figures as foraminous or as designed for transverse flow. In addition, Fig. 6 is devoid of any reference to walls and of any indication how or where a vacuum would be introduced. It is not credible that a person skilled in the art could have worked out the placement of an effective vacuum and walls for an embodiment such as that shown in Fig. 6.

The prosecution history shows that the inventors were limited in their invention to the embodiments in which transverse flow guide rolls and evacuation were depicted. I concluded that it would be misleading to imply to the jury through the use of exhibits 167 and 168 that Soininen did use vacuum rolls in the embodiment shown in Fig. 6 or even that Soininen specified foraminous rollers in this particular embodiment for which Hauser's suction rolls could be substituted. The model (exh. # 168) was misleading in other respects as well: it did not demonstrate the true size of the vacuum source that would be necessary for a real dryer section to run, and it implied, without foundation, that an entire dryer section could be built

successfully following Soininen's suggested embodiment.

Even if the decision to exclude these two exhibits was erroneous, it did not have any significant effect on the outcome of the trial. Although Valmet was barred from arguing that Soininen had shown foraminous rollers in Fig. 6, it had ample opportunities to argue that Hauser had shown the addition of suction rollers to the Fig. 6 embodiment and to argue to the jury how this would have produced an invention coming within the claims of Beloit's '758 patent.

■ In other pretrial actions, I ruled that Valmet could not introduce into evidence the deposition testimony of Mauri Soininen. I determined that a large portion of the testimony was either given in response to leading questions or lacked proper foundation or was cumulative of the testimony of other witnesses. To the extent the testimony was not cumulative, it tended to enlarge impermissibly on the teachings of the patent. Given these problems and the potential confusion to the jury of suggesting that the inventor's post-expiration view of the patented invention should be given more weight than the actual claims of the patent, the testimony was not allowed.

Although Valmet has devoted many pages of its post-trial briefs to challenging these evidentiary rulings, I am not convinced that they were erroneous or that if they were, that the error is of such a nature as to require a new trial. Therefore, Valmet's motion will be denied as it relates to its assertions of the obviousness of claims 1 and 2 of Beloit's '758 patent.

3. *Infringement*

a. Literal infringement

■ Valmet attacks the jury's finding of infringement, arguing that the vacuum rolls of the APM machine are not in close proximity to their adjacent drying cylinders. According to Valmet, the term "close proximity" is defined in the '758 patent only by result, that is, the vacuum rolls and dryer cylinders are to be spaced so as to make the draw between the two minimal and thereby inhibit any tendency of the web to flutter.

But the APM machine cannot flutter, Valmet maintains, simply because of the slow speeds at which the machine operates and the weight of the web (liner board) being transported; therefore, the baseline for determining "close proximity" is non-existent and there is no way to determine whether the APM machine infringes. Valmet's argument fails because the jury could have found, reasonably, that the reason the APM machine inhibited flutter was not just the machine's slow speed and heavy web but its incorporation of the patented Beloit design. The jury heard evidence that Valmet had reduced the draw for the APM machine to what it believed was the closest safe distance ("close proximity"), that liner board is not immune from the forces that cause flutter, and that the machine was designed to run at fast speeds and was capable of doing so. Although Matti Kankaanpaa testified that the APM machine operated slowly, Kankaanpaa was Valmet's former president and therefore not a disinterested witness. Moreover, he had retired from Valmet before the APM machine had been designed or built. The jury may have found his testimony unpersuasive in view of his alignment with Valmet and his admitted lack of familiarity with the APM machine and its design speed. I conclude that Valmet has failed to show that no reasonable jury could have found literal infringement by the APM machine. The verdict is not against the clear weight of the evidence.

b. Infringement by the doctrine of equivalents

■ Valmet has failed to show that the jury had insufficient evidence on which to find that Valmet had infringed Beloit's patents under the doctrine of equivalents. Essentially, Valmet makes the same argument that the APM machine does not rely on minimal draw length to inhibit flutter because it does not need to, given the slow operating speed of the machine and the weight of the liner board. The jury was entitled to disbelieve this argument in deciding infringement by the doctrine of equivalents just as it did in deciding literal infringement. Valmet's motion for judgment as a matter of law or for new trial will be denied on the issue of infringement.

4. *Inequitable conduct*

■ At trial, Valmet presented evidence of what it contends was inequitable conduct by Beloit. I found the evidence unpersuasive; Valmet contends that I erred in reaching that conclusion and that I failed to make sufficient findings to permit the ruling to be appealed.

Valmet argues that it established inequitable conduct in two entirely separate respects. First, it proved that when Dirk Veneman, Beloit's patent counsel, and David Archer, Beloit's patent agent, submitted a copy of the German Hauser patent application to the patent office, they did not submit an English translation of the application that they had in their possession at the time. Second, Valmet argues that it proved that Veneman made a misleading statement on two separate occasions in applications for expedited handling (Petitions to Make Special), filed in connection with both of the patents at issue. The allegedly misleading statements are Veneman's declarations that he had good knowledge of the pertinent prior art, when, according to Valmet (1) he had not read or even looked at each of the more than forty prior art references he submitted to the patent office in the Information Disclosure Statements and (2) he could not have read the Hauser application because he cannot read German.

Although Valmet argues that it was error to find no inequitable conduct on Beloit's failure to supply the English translation of Hauser, it does not seek reconsideration of this issue. However, it does maintain that I failed to rule on its second asserted instance of inequitable conduct and that it is entitled to judgment in its favor on this ground. I am not convinced that Valmet made it clear at trial that it was raising two separate grounds, but for the record, from the evidence adduced at trial I make the following findings of fact on the second alleged ground for a finding of inequitable conduct.

*Findings of Fact*

In two Petitions to Make Special, one filed on February 6, 1992 in connection with the application for what became the '758 patent, and one filed on April 8, 1992 in connection with the application for what became the '372 patent, Beloit's chief patent counsel, Dirk Veneman, declared under oath that he had a good knowledge of the pertinent prior art. Before 1992, Beloit had filed a number of applications for patents on various aspects of dryer sections, had made many prior art searches and had been subjected to examination by the United States Patent and Trademark Office and foreign patent authorities. Both the '758 and the '372 patents were the subjects of extensive prosecutions. When Beloit filed its applications for the '758 and '372 patents, it submitted the pertinent prior art that it had learned of as a result of the prosecution of the related applications and from other sources.

When Veneman made his declarations, he had never read the Hauser application; he had in his possession only the original German version and he did not read German. However, in February 1992, he had reviewed the drawings in the Hauser application and had reviewed the application with Beloit's outside patent counsel and compared it with Beloit's own Goodwillie patent in preparation for litigation with Hauser's employer, Voith, GmbH. Veneman did not re-read all of the prior art references immediately before he made his declarations in February and April 1992, but he was familiar with all of the art cited.

Veneman's declarations were neither misleading nor false. He did have a good knowledge of all the prior art when he made his declaration.

*Conclusion*

In the absence of any showing that Veneman made false or misleading declarations to the patent office, I conclude that Valmet has failed to prove clearly and convincingly its second alleged ground for a finding of inequitable conduct.

### 5. Indefiniteness

At the end of the validity phase of the trial, the jury returned a special verdict in which it found that Valmet had proved by clear and convincing evidence that claims 1 and 2 of Beloit's '372 patent and claim 3 of its '758 patent were indefinite but that Valmet had failed to make such a showing with respect to claims 1 and 2 of the '758 patent. Valmet contends that these special verdicts are inconsistent and irreconcilable and require the granting of a new trial. Belatedly, in its brief in opposition to Beloit's motion for judgment as a matter of law on this issue, Valmet notes that it moved for judgment as a matter of law before the verdict went to the jury, thereby preserving its right to seek judgment as a matter of law at this time.

In its own motion for judgment as a matter of law on this issue, Beloit argues that the court should enter judgment in Beloit's favor on all the questions relating to indefiniteness because it is clear from the answers and the claims to which they related that the jury based its findings of indefiniteness not on "close proximity" but on cylinder sizes, an issue that was not argued to the jury. In addition, Beloit challenges Valmet's right either to ask for a new trial when it failed to raise the alleged error before the jury was discharged or to seek judgment as a matter of law now when it failed to do so within 10 days of the date of entry of judgment.

In determining a procedural question in a patent case such as whether a party waives its right to seek a new trial on the basis of an inconsistent verdict if it fails to alert the court to the alleged inconsistency while the jury is still empaneled, a district court is to look to the law of the regional circuit within which it is located. *Delta–X Corp. v. Baker Hughes Production Tools, Inc.*, 984 F.2d 410, 412 (Fed.Cir.1993) (citing *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 858 (Fed.Cir.1991), *cert. denied,* 504 U.S. 980, 112 S.Ct. 2957, 119 L.Ed.2d 579 (1992)). In this instance, doing so does not elicit any guidance because the Court of Appeals for the Seventh Circuit has never had occasion to address the particular question raised by Valmet's omission. However, it is unnecessary to reach that question

or the related one, which is whether Valmet can move for judgment as a matter of law more than 10 days after entry of judgment. I am convinced that it is the jury's finding of *indefiniteness* that is unsupported by any evidence and must be corrected, rather than its finding that claims 1 and 2 of the '758 patent are not indefinite.

Beloit argues convincingly that the jury must have been considering cylinder sizes when it found claim 3 of the '758 patent and claims 1 and 2 of the '372 patent indefinite. No other explanation can be made for the jury's answers. Claims 1 and 2 of the '758 patent contain no reference to cylinder sizes; all the other claims do. Valmet admits that it never challenged the indefiniteness of any claims as they concerned the relative sizes of the dryer and vacuum cylinders and that it does not do so now. However, Heikki Ilvespaa, a Valmet employee, testified that he could only estimate the size of the vacuum rolls in Beloit's proposed machine as having diameters somewhere between 20 and 24 inches. Tr., 6–A, at 103. This testimony could explain the jury's decision to find the claims that included references to cylinder sizes indefinite.

The answers to the special verdict questions are not inconsistent because the three claims the jury found indefinite each contain the additional limitation relating to the size of the vacuum rolls and dryer cylinders, but the findings of indefiniteness are not supported by any substantial evidence. Valmet concedes that it did not argue the indefiniteness of the cylinder sizes or make any effort to introduce evidence on cylinder size but instead based its challenge to the claims solely on the alleged indefiniteness of the words, "close proximity." Because I am convinced that the jury found indefiniteness only because it believed a person of ordinary skill in the art would not understand what sizes the cylinders should be and because there was no evidence to support such a finding and ample evidence to the contrary, I will enter judgment as a matter of law for Beloit on this issue. Doing so does not require a new trial on damages: the award would not have been any different had the jury been considering

both infringed patents or just the '758 patent, since both related to the same machine.

### 6. *Damages*

At the end of the trial, the jury determined that Beloit would have made the sale of the APM machine had it not been for Valmet's infringement of Beloit's '758 patent and awarded Beloit $7,875,000 in lost profits of which $1,275,000 represents lost income on working capital. Valmet attacks the award on several grounds: Beloit failed to prove a reasonable probability that its total lost profits would have been over $7,000,000 because it failed to prove that APM would have paid Beloit as much as Beloit claimed; there is no legal authority for an award of lost income on working capital; lost interest on working capital is simply a subterfuge to avoid the principle that prejudgment interest does not start to accrue until there is actual infringement by an operable structure; and even if there could be a valid claim for lost interest on working capital in certain situations, Beloit offered nothing but speculative evidence in its attempt to prove it suffered such a loss in this instance.

#### a. Lost working capital

Valmet asks the court either to vacate the jury verdict awarding Beloit $1,275,000 in lost income on working capital or order a new trial on this issue. Valmet's motion raises a threshold issue because the record does not show that Valmet made a motion for judgment as a matter of law before the recoverability of lost working capital issue was submitted to the jury. Beloit contends that Valmet's omission forecloses it from moving now for judgment on this issue.

This circuit has taken a liberal view of motions for judgment as a matter of law. *See, e.g., Benson v. Allphin,* 786 F.2d 268 (7th Cir.1986). "[S]omething less than a formal motion for a directed verdict" suffices to preserve a party's right to move for judgment notwithstanding the jury's verdict when the motion is based solely on a question of law. *Id.* at 274. However, the 1991 amendments to the Civil Rules suggest that this liberality is to be discouraged:

revision [imposing requirement that the moving party articulate the basis on which a judgment as a matter of law might be rendered] thus alters the result in cases in which courts have used various techniques to avoid the requirement that a motion for a directed verdict be made as a predicate to a motion for judgment notwithstanding the verdict. E.g., *Benson v. Allphin*, 786 [sic:] F.2d 268 (7th Cir.1986).

Fed.R.Civ.P. 50 advisory committee's note, 1991 amendment. A fair reading of this statement in light of the purposes of Rule 50, the exigencies of trial, and the ease of appellate review is that the party moving for judgment as a matter of law after trial must have made known to the court and opposing counsel the reasons it believed its opponent's case was insufficient while there was still time for opposing counsel to repair any evidentiary omission.

> In no event, however, should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact.... [purpose for requirement that motion for judgment as a matter of law be made before the close of trial] is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment.

*Id.* However, these concerns are not present when the moving party argues, as Valmet does, that the facts are irrelevant because the law does not permit recovery for lost interest on working capital under any circumstances.

■■■■■ In any event, it makes little difference whether Valmet is barred from seeking judgment as a matter of law on this issue by its failure to move for judgment as a matter of law before the close of evidence because I would deny the motion. I am convinced that lost interest on working capital is an appropriate item of damages, if properly substantiated. The framework for Beloit's claim is that paper making machines are so specialized and involve such large commitments of resources from the manufac-

turer that it is the custom in the industry for the buyer to make large periodic payments on the purchase price in advance, rather than paying for the machine after it has been delivered and installed. It is also the custom that these payments are not tied to contract progress but are made according to a schedule set by the parties at the time of contracting. In the early stages of the manufacturing process, the manufacturer receives incoming payments before it incurs the variable labor and material expenses related to making the machine and can invest the money to produce income until it is needed. Assuming for now that Beloit proved what it would have been able to earn on the advance periodic payments, I see no reason why Beloit could not recover for lost interest on working capital, just as it should be able to recover for any other loss that Valmet caused. It is true that Beloit has not found a case holding that lost interest on working capital can be recovered from a tortfeasor, but Valmet has presented no authority to the contrary.

■■■■■ Valmet argues that lost interest on working capital cannot be awarded because doing so would circumvent the legal rules limiting the award of prejudgment interest to the period running to the date of judgment (November 28, 1994) from the date of infringement, that is, according to Valmet, the day the infringing device is operable and ready for use. As Valmet calculates it, the date on which prejudgment interest should begin to run is the date of full operation, which in this case was April 30, 1994, the approximate day the APM machine was began running. Beloit's position is that it is entitled to interest on the working capital it would have received from September 8, 1992, the date Beloit's '758 patent issued and coincidentally, the date APM and Valmet entered into the agreement for the purchase of the paper machine, to August 1993, the date Beloit postulates it would have delivered the machine to APM. Because I view the claim for lost interest on working capital as a legitimate item of damages, I do not interpret Beloit's request as a stratagem for avoiding the usual constraints on prejudgment interest.

Whether Beloit adduced sufficient evidence to support the jury's finding is a question that Valmet can raise only on a motion for new trial. Although there is some question whether Valmet is barred from seeking judgment as a matter of law on the legal basis for Beloit's lost income on working capital claim, it is clear that Valmet's failure to move before the close of trial for judgment as a matter of law on the sufficiency of the evidence in support of Beloit's claim bars it from making such a motion after trial. Therefore, I evaluate Valmet's challenge under the standards applicable to the grant of a new trial: whether the jury's damages verdict is against the clear weight of the evidence.

Valmet characterizes Beloit's evidence of its lost interest on working capital as speculative, without acknowledging that its own wrongful acts deprived Beloit of the opportunity to negotiate a contract with APM free from competition from an infringing machine. It is impossible to know with certainty what APM would have agreed to had Beloit been the only company offering the alternating single tier technology, but Beloit cannot be penalized for a lack of evidence occasioned by Valmet's unlawful actions. *Lam, Inc. v. Johns–Manville Corp.,* 718 F.2d 1056, 1065 (Fed.Cir.1983) (risk of uncertainty should be borne by wrongdoer and not by injured party). The jury was entitled to make its best estimate of what Beloit would have negotiated and what it would have received had Valmet not engaged in its infringing activities.

The jury heard all of Valmet's arguments, its evidence, and its cross-examination of Beloit's witnesses and concluded that Beloit's evidence was more credible. I cannot say that it erred in this conclusion. The evidence showed that APM wanted Beloit's technology; it is the custom in the industry to negotiate for advance periodic payments of working capital; and Valmet received an advance payment. Valmet argues that the evidence showed that APM rejected Beloit's only bid containing a progress payment provision before it had received any bid from Valmet. However, the jury was free to believe that APM would have come back to Beloit and acceded to Beloit's terms had it not had the option of buying the same technology from Valmet.

Valmet argues that neither the law nor the evidence supports an award of lost interest on working capital for the period from April 1, 1992 until September 8, 1992, when the patent issued. Beloit does not contest this point, *see* Beloit's Brief in Opposition to Valmet's Motion for Judgment as a Matter of Law, dkt. # 549, at 83, but argues that the jury's verdict does not include any award for the disputed period. The jury was instructed that infringement could not occur until a patent issues (September 8, 1992); the court must assume the jury followed the instructions it was given; and the jury's decision to discount by $200,000 the amount Beloit asked for as lost interest on working capital indicates that it did follow the instructions. I cannot say with conviction that the jury disregarded its instructions and erred in awarding Beloit $1,275,000 for lost interest on working capital.

b.  Lost profits

Valmet contends that Beloit adduced no substantial evidence in support of its claim for lost profits. This contention can be disposed of with dispatch: it is nothing more than a rehash of the arguments Valmet made to the jury, which the jury rejected. There was sufficient evidence from which to find that Beloit had incurred damages representing lost profits of $6,600,000 ($7,875,000 less $1,275,000 for lost interest on working capital). Valmet adds that the damage claim included a component that was without any basis whatsoever: the intercompany profits Beloit's affiliated company would have made from sales to Beloit. I agree with Valmet that the evidence did not support this claim, but this does not change my opinion about the validity of the jury's damage verdict. There is no reason to believe that the jury found the evidence on this point any more persuasive than I did and therefore, no reason to believe that it included any of these intercompany "profits" in its damage determination. It could have found $6,600,000 in lost profits without including the intercompany charges. I presume that it did so.

## B. *Beloit's Motion for an Injunction*

Beloit seeks a permanent injunction to enjoin Valmet from future infringement of Beloit's '758 patent. Valmet makes a pro forma objection to the idea of an injunction, asserting that it has taken steps to avoid infringing and will continue to do so, but it saves its energy for objections to the form the injunction will take. I have no doubt that an injunction should issue. Despite Valmet's assertions of its good faith and efforts not to infringe, the fact is that Valmet continued its infringing activities after this suit was brought and after it knew that a jury had found the '758 patent not invalid in a previous case involving Beloit and Voith, GmbH.

Valmet's first objection to the form of permanent objection proposed by Beloit is directed to the provision that would enjoin Valmet from manufacturing, using, etc., any "paper-making machine having a dryer section that infringes said claim 1 or claim 2 or is the same as, or equivalent to, the dryer section of the [APM] machine" in Prewitt, New Mexico. Valmet contends that it is improper to prohibit the infringing equivalent of an adjudicated infringing device because such restraints are too broad and too vague to be enforced fairly. In response, Beloit cites *KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1525 (Fed.Cir.1985), in which the Federal Circuit cited with approval the idea expressed in *American Foundry & Manufacturing Co. v. Josam Manufacturing Co.*, 79 F.2d 116, 118 (8th Cir.1935), that injunctions typically "carry a prohibition against further infringement ... as to the particular device found to be infringement and as to all other devices which are merely 'colorable' changes of the infringing one." Construing "equivalent to" the APM dryer section as meaning a dryer section with only "colorable" changes, I see no reason not to make this requirement a part of the injunction. Valmet argues that the requested restraints will require it to make "legal leaps of faith concerning what may be 'an infringing equivalent' of the adjudicated infringing device," Valmet's Memorandum in Opposition to Beloit's Motion for a Preliminary Injunction, dkt. # 547 at 8, but does not explain why it is more difficult to design around an equivalent machine than an invention disclosed in a patent.

Valmet makes more substantive objections to an injunction that would prevent it from using any part of the APM machine as a reference, even those parts that are separate from the dryer section and whose effectiveness is not dependent on the dryer section. Valmet argues that some of these parts are innovations that it should be able to show to prospective customers and discuss in sales literature. These include a "mini-fourdrinier," which is part of the forming section in the wet end of the machine, and a sleeve-belt press, which Valmet says has nothing to do with the dryer or with Beloit's '758 patent.

To the extent that Valmet's innovative contributions to the APM machine can be evaluated independently of the dryer section, Valmet should not be enjoined from using them as references. However, it is Valmet's burden to establish that the infringing dryer section makes no contribution to the effectiveness of the particular part it wishes to use as a reference. Thus, for example, if Valmet can show that the performance of the mini-fourdrinier can be gauged without reference to the final liner board product, Valmet should be free to use it as a reference. On the other hand, if a prospective customer would consider the final product indicative of the performance of the mini-fourdrinier, Valmet cannot use the part as a reference. In that circumstance, the part's effectiveness cannot be evaluated independently of the dryer section and Valmet would be receiving the benefit of dryer section improvements it obtained improperly through infringement.

For the present, I will enjoin Valmet from using any part of its APM machine as a reference, subject to its showing that any one or more parts of the machine could be used as references without posing any risk that Valmet would benefit from the successful operation of the infringing aspects of the APM machine. If Valmet cannot obtain Beloit's agreement to the use of any part as a reference, it may seek an order from this court.

Under paragraphs 2, 4 and 6 of Beloit's proposed injunctive order, Valmet would be

required to present to the court and to counsel for Beloit a drawing of any dryer section it proposed to sell that would have a top felted single tier section followed by a bottom felted single tier section. In addition, Valmet would be forbidden to provide any assistance, information, repairs, spare parts or any other form of support for the continued operation of the APM machine in New Mexico and would have to provide quarterly reports to the court detailing the steps it has taken to comply with the terms of the order during the preceding quarter. Not surprisingly, Valmet objects to the scope of the proposed order.

■ Requiring an infringer to advise the court and counsel for its competitor of commercial proposals is an unusual condition to be included in an injunction. Beloit makes a strong argument for including such a requirement here because of the long lead time involved in the sale of one paper making machine. Two to three years could pass with large investments by manufacturer and customer before the patent holder would know of a potential infringer. Calling off a sale at that point would benefit neither Valmet nor its customers. Nonetheless, I am not convinced that imposing a condition of pre-offer approval is necessary to deter Valmet from offering an infringing machine to any of its customers. The long lead times and the high costs of paper making machinery work as much in Beloit's favor as against it, because they create an incentive for Valmet to avoid offering an infringing machine. Valmet would incur a greater economic loss than Beloit if it invested years and millions of dollars in a machine only to learn that it could not sell or install it and was subject to additional court sanctions because it had infringed Beloit's patents.

To impose a condition of pre-offer approval would be draconian, particularly in the unusual circumstances of the tiny and fiercely competitive paper making machine community and in the absence of a finding of willfulness by the jury. If such a condition is to be imposed, the movant would have to make a far stronger showing of need than Beloit has made in this case. Cf. *Spindelfabrik Suessen–Schurr v. Schubert & Salzer,* 903 F.2d 1568 (Fed.Cir.1990) (imposing condition of pre-offer approval on infringer after it had been held in contempt twice for violating a permanent injunction).

■ The most difficult question presented by Beloit's request for injunction is whether Valmet should be prohibited from selling spare parts and assisting in the continued operation of the APM machine. Valmet makes a persuasive argument that the jury has compensated Beloit for its loss of income from the sale of spare parts to APM, making it unnecessary and in fact, the equivalent of a double award, for Valmet to be enjoined from selling spare parts in the future. In other words, Valmet argues that the jury's damage award constitutes a license for which Valmet has paid by virtue of the judgment entered against it and under which it can continue to service and repair the APM machine and supply spare parts.

Neither party has cited any cases that shed light on this question. The cases cited by Valmet are inapposite. *Stickle v. Heublein, Inc.,* 716 F.2d 1550 (Fed.Cir.1983), concerned the propriety of issuing an injunction against the *user* of an infringing machine, in a case in which reasonable royalties were the measure of damages. *King Instrument v. Otari,* 767 F.2d 853 (Fed.Cir.1985), addresses whether the patent holder had sufficiently proved that the spare parts would be sold with the infringed product so as to be able to recover damages for the loss of sales of the spares. Finally, in *Spindelfabrik Suessen–Schurr,* 903 F.2d at 1574, the Court of Appeals for the Federal Circuit made a passing reference to a provision in the district court's order exempting restrictions for servicing and supply of spare parts for certain "previously identified machines dealt with" in a previous order but failed to explain the reason for the exemption. For its part, Beloit quotes an extensive passage from a district court opinion, *Laitram Corp. v. Cambridge Wire Cloth Co.,* 229 USPQ 933, 1986 WL 89633 (D.Md.1986), that does not appear to have been cited or followed by any other court.

I conclude that Valmet should be permitted to sell spare parts to APM because the jury has compensated Beloit for its estimated

losses on these sales. (Beloit's suggestion that the jury made no award for loss sales is without any foundation in the record; Beloit's counsel argued to the jury the losses of future sales of spare parts.) Once Valmet has satisfied the judgment, it can sell spare parts to APM. However, because the jury has found Valmet liable for infringement, it should not be allowed to continue to contribute to that infringement by providing maintenance services, repairs or engineering consultation to the APM machine. Valmet has not argued that preventing it from providing such services or consultation will leave APM without recourse; I assume therefore, that APM has sources other than Valmet to take care of these needs.

Finally, I will include as part of the injunction the provision that Valmet report on its compliance, although twice a year for the life of the patent should be sufficient for monitoring purposes. The same requirement has been imposed in another case in which Beloit was the prevailing party; it has proved to be a workable requirement.

### C. *Beloit's Motion for Attorney Fees*

Beloit seeks an award of attorney fees, which requires a preliminary finding that this was an exceptional case meriting such an award, 35 U.S.C. § 285 (attorney fees may be awarded to prevailing party "in exceptional cases"), or that Valmet's counsel engaged in "vexatious litigation strategy," *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1549 (Fed.Cir.1989). Beloit has failed to show, clearly and convincingly, that this case was exceptional or that Valmet's counsel's litigation conduct was vexatious. *Advance Transformer Co. v. Levinson*, 837 F.2d 1081, 1085 (Fed.Cir.1988) (finding that case is exceptional must be supported by clear and convincing evidence). Beloit is right to be annoyed over the last minute trip to Finland to take the useless deposition of Mauri Soininen, but it has been reimbursed for the costs of that trip, if not for the fees of counsel. It contends that the grant of partial summary judgment on infringement of Valmet's patent and Valmet's claim of anticipation demonstrates that these claims were meritless and that Valmet's failure to argue indefiniteness to the jury shows that it had abandoned this claim. Beloit's arguments fall far short of the clear and convincing evidence required to make out either an exceptional case or flagrant misconduct.

In a case as complex as this one, it is understandable that discovery disputes would arise. I cannot say that any of Valmet's delays in production were egregious or that Beloit did not cause similar delays in its own production. Valmet deserves no kudos for producing Rule 30(b)(6) witnesses who were uninformed on much of the subject matter of their testimony, but this error falls short of establishing a *strategy* of vexatious litigation. As to the motions for partial summary judgment, I cannot say that Valmet's claims of infringement and anticipation were so lacking in merit as to justify a finding of litigation misconduct. Beloit characterizes those claims as "preemptive strikes," raised only to create bargaining leverage when it became clear that the APM machine was infringing. A competitor and adversary might well view them in that light; an objective observer would not. Finally, Beloit's conclusion that Valmet had abandoned its allegations of indefiniteness is not the conclusion drawn by the jury, which found for Valmet on that ground on three of the five claims at issue.

It is difficult for a prevailing party to demonstrate that a case is exceptional and almost impossible to do so in the absence of a finding of willfulness. *Beckman Instruments, Inc.*, 892 F.2d at 1552 ("We are aware of few cases in which a patent owner has been granted attorney fees solely on the basis of litigation misconduct, without a concurrent finding of willful infringement."). I am not convinced that Beloit has shown Valmet to be guilty of extraordinary litigation misconduct so as to warrant the unusual finding of exceptionalness without the predicate finding of willfulness. Therefore, Beloit's motion for an award of attorney fees will be denied.

### D. *Beloit's Request for Prejudgment Interest*

Beloit and Valmet disagree about both the scope and rate of prejudgment interest. Beloit contends that prejudgment interest

should apply to its lost income on working capital as well as to the remainder of the lost profits award. It contends that prejudgment interest should be calculated from August 1, 1993, the day it would have lost the benefit of the working capital and its lost profits claim would have become fixed, with its receipt of the last payment from APM. Finally, it argues that the interest rate to be applied should be either 16%, the rate set in Valmet's contract with APM, or 12%, which is the amount set by the Wisconsin statutes. Valmet contends that awarding prejudgment interest on top of the lost income on working capital award would be duplicative, that prejudgment interest should not start to run until the date of infringement, which is the date the APM machine went into operation (approximately April 30, 1994), and that the rate should be no more than 5.7%, which is the average rate at which Beloit could have borrowed money from a commercial lender during the period in question.

█ In an earlier case involving Beloit's '758 patent and a different competitor, Voith GmbH, Case No. 92–C–168–C, I held that any award of prejudgment interest would be duplicative of the jury's award of lost working capital as part of its award of a reasonable royalty. In various rulings made during the course of this trial, I indicated that I continued to view prejudgment interest as duplicative of any award of lost income on working capital. It was for this reason that the jury was asked to specify in its special verdict on damages what portion of the lost profits award constituted lost interest on working capital. In reviewing this case, however, I am persuaded that the two concepts can be separated and that prejudgment interest can be applied to the award of lost income on working capital without multiplying the award impermissibly. Beloit has shown both that its working capital advantage would have come to an end and its lost profits would have become fixed on August 1, 1993, the date the machine would have been delivered to APM and payments would have stopped. Assuming as I do that the jury calculated Beloit's lost working capital damages properly, applying prejudgment interest to this figure from August 1, 1993 to the date of judgment would not be duplicating the original award of lost income on working capital.

█ But because August 1, 1993 was approximately eight months before the date the APM machine became operational, there remains a question whether it is appropriate to calculate prejudgment interest for any period before the APM machine was in operation. Although Valmet argues now that the machine could not have infringed until it was fully operational, it contended in the original complaint it filed in this case on *January 26, 1993* that an actual controversy existed between it and Beloit regarding the infringement of the '758 patent. Valmet's contention supports the conclusion that the act of infringement occurred when Valmet contracted for the sale of the infringing dryer section on September 8, 1992. 35 U.S.C. § 271; *Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 16 (Fed.Cir.1984) (meaning of "make," "use" and "sell" in § 271 was left by Congress to judicial interpretation). Valmet cites cases it contends mandate the conclusion that infringement does not occur until the machine has been put into operation and it can be determined with certainty that infringement has occurred, but the cases are inapposite. They do not relate to damage determinations, but to injunctions or questions of standing. *See, e.g., Eli Lilly & Co. v. Medtronic, Inc.*, 915 F.2d 670 (Fed.Cir.1990) (injunction); *Lang v. Pacific Marine & Supply Co.*, 895 F.2d 761 (Fed.Cir.1990) (same); *Ecodyne Corp v. Croll–Reynolds Engineering Co.*, 491 F.Supp. 194 (D.Conn.1979) (standing).

The purpose of awarding prejudgment interest under 35 U.S.C. § 284 is to afford patent owners complete compensation for their damages. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). If Beloit is awarded prejudgment interest from August 1, 1993 (the date on which its working capital advantage ceased and its lost profits became fixed), it will be put in as good a position as it would have been without the infringement. *Id.* (in typical case award of prejudgment interest is necessary to put patent owner in as good a position as he would have been had

infringer entered into reasonable royalty agreement).

At one place in its brief, Beloit suggests that prejudgment interest should be applied to the mean of its working capital payments. I do not understand this request. If Beloit is suggesting that it should receive prejudgment interest on its award of lost income on working capital for the period before August 1, 1993, its argument is inconsistent with the rest of its brief, in which it asserts (in words and charts) that prejudgment interest should run *from August 1, 1993*. Moreover, there is no reason to think that the jury did not take into account all of the income Beloit could have reasonably earned on its working capital advantage prior to August 1, 1993. If Beloit is suggesting that prejudgment interest should run on the mean of its lost income on working capital for the period August 1, 1993 until the date of judgment, it has not explained why the award should be discounted in this respect. My understanding is that as of August 1 Beloit would have received all of the advantage of its working capital and would have had in hand the full amount of the income generated from the investment of its working capital advantage. If so, it is entitled to prejudgment interest on that full amount. Valmet made no comment on this point; it may have been as mystified as I am by the request. Either side is free to raise this issue on a motion for reconsideration.

▪▪▪ I turn then to the issue of the rate of prejudgment interest. Beloit wants 16%, because that is the amount specified in the APM–Valmet contract, but it is clear that the 16% in the contract is intended to be a penalty to inspire Valmet to perform its part of the contract in a timely fashion. Beloit's alternative 12% figure rests on the Wisconsin statutes, which are not necessarily an apt guide to the appropriate rate for a patent case in federal court. Beloit's fallback position is that it should receive its "cost of capital" rate, which its experts calculated at 10.5% for their working capital calculations. For its part, Valmet wants the interest rate pegged at between 5.5% and 5.9%, which it contends is the rate at which Beloit was able to borrow money during the time in question. Rather than fix on any one of the four differ-

ent options proffered by the parties, I believe the prudent course is to apply the prime rate in effect on August 1, 1993. It is an objective figure that can be readily ascertained and its use has been approved by the Federal Circuit in a number of cases. *See, e.g., Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 939 F.2d 1540, 1545 (Fed.Cir.1991); *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.,* 862 F.2d 1564, 1879–80 (Fed.Cir.1988).

My research discloses that on August 1, 1993, two major midwestern banks, First Chicago and Continental, were quoting a prime rate of 6% (and, in fact, had been quoting the same rate since July 2, 1992 and would do so until about April 1, 1994). I am satisfied that 6% is an appropriate rate for determining prejudgment interest.

## ORDER

IT IS ORDERED that

1. The motion of Valmet Paper Machinery, Inc. and Valmet–Charlotte, Inc., for judgment as a matter of law or in the alternative for a new trial is DENIED in all respects;

2. Beloit Corporation's motion for judgment as a matter of law on the jury's finding of indefiniteness with respect to claim 3 of Beloit's '758 patent and claims 1 and 2 of Beloit's '372 patent is GRANTED and these claims are held not to be indefinite;

3a. Beloit's motion for an injunction is GRANTED and Valmet Paper Machinery, Inc. and Valmet–Charlotte, Inc., jointly and severally, and their officers, directors, affiliates, agents, servants, employees, and attorneys, and all those persons acting in concert with any of them who receive actual notice of this order by personal service or otherwise, are hereby enjoined until further order of this court or during the respective term of the patent in suit, from infringing (directly, contributorily, or by inducement) any one or more of claims 1, 2 and 3 of United States Letters Patent No. 5,144,758 and claims 1 and 2 of United States Letters Patent No. 5,429,372, including but without limitation, by manufacture, distribution, use, sale, importation into the United States, subassembly in the United States for distribution abroad, or

any other activity that would have as its natural or intended purpose the manufacture, sale, or use of any paper making machine having a dryer section that infringes said claims or is the same as, or equivalent to, the dryer section of the Australian Paper Manufacturers McKinley Paper Co. Machine No. 1 installed by Valmet at Prewitt, New Mexico.

b. Within 30 days of this order, Valmet shall by written notice withdraw any bids previously submitted in the United States for the sale of any paper making machine dryer section that is the same as or equivalent to the dryer section of the APM machine.

c. So long as the infringing APM machine installed at Prewitt, New Mexico, falls within the scope of any claim identified in paragraph 3(a) of this order, either directly, indirectly, or by equivalents, Valmet is hereby enjoined from providing, either directly or indirectly (such as by assisting others), information, technical or manual assistance, repairs, advice, or any other form of support, aid, abetment, or encouragement, for the continued operation of the machine, including, but without limitation, providing, either directly or through third parties, information, translations, lists, drawings, sketches, manuals, specifications, dimensions, workers for, the name or names of parties or suppliers with such information or materials, or any other activity or support that would aid any third party or APM in the continued operation, repair, maintenance or rebuilding of the infringing APM machine.

d. Valmet shall not make direct or indirect use of the APM machine in any sales, marketing, advertising or other similar activities including, but not limited to, sales presentations, brochures, magazine articles or delivery of technical papers without obtaining either the approval of Beloit or an order of this court in advance of any such use. Valmet shall not show or use the APM machine as a reference machine or otherwise show the APM machine to customers or potential customers without obtaining either the approval of Beloit or an order of this court in advance of such showing or use.

e. On April 1 and October 1 of each year during the pendency of this injunction order, Valmet shall file with the clerk of court under oath signed by one responsible official of each of the two Valmet companies, a written report of compliance (with a copy to house patent counsel for Beloit), detailing the steps Valmet has taken during the preceding half-year period to comply with the terms of this order and acknowledging specifically that there has been no violation of the terms of this order or detailing any violation and the reason or reasons therefore.

f. This court shall retain jurisdiction of this action for the purpose of enforcing this order.

4. Beloit's motion for a declaration that this is an exceptional case and for an award of attorney fees is DENIED; and

5. Beloit is awarded prejudgment interest on the jury's monetary award or $7,875,000 for the period August 1, 1993 through November 28, 1994 at the rate of 6%, compounded daily.