**CAE SCREENPLATES, INC., Plaintiff,**

v.

**BELOIT CORPORATION, et al., Defendants.**

**Civil Action No. 96–1304–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 20, 1997.

Robert Arthur Vanderhye, Nixon & Vanderhye, P.C., Arlington, VA, for Plaintiff.

Victor M. Wigman, Wigman, Cohen, Leitner & Myers, P.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Subject matter jurisdiction is disputed in this declaratory judgment action in which a putative infringer seeks a declaration of non-infringement, unenforceability, and invalidity of a patent. As so often happens, plaintiff, the putative infringer, filed a declaratory judgment action hoping to have its choice of forum for the anticipated suit. Defendant, the patentee, claims that plaintiff acted too hastily as, at the time the suit was filed, plaintiff had no objective, reasonable apprehension of being sued for patent infringement and, thus, there was then no actual controversy between the parties as required for jurisdiction. Plaintiff disagrees, and claims that it needs discovery to ferret out facts to support its jurisdictional allegations. Accordingly, the threshold jurisdictional questions presented are: (1) whether plaintiff, in aid of its claim of jurisdiction, should be permitted to discover facts and circumstances it did not know at the time of the filing of the complaint; and (2) whether, in the absence of such discovery, the record facts reflect the objective, reasonable apprehension of a suit required to establish jurisdiction.

### I

In the early 1980s, defendant, Beloit Corporation ("Beloit"), one of the nation's foremost producers of papermaking machinery, developed a new device for screening, or filtering, slurry stock (i.e., pulp and water) before it flowed to the headbox of the paper machine. This device, which consisted of a drum-like "S–Rotor" that operated within a cylindrical screenplate or "basket," extracts shives, particles, dirt and other impurities

from the slurry stock. Although Beloit itself manufactured the S–Rotors, it subcontracted the production of the cylindrical screenplates to a division of Ahlstrom Machinery, Inc. ("Ahlstrom"). During 1987–1988, Beloit began to receive numerous and repeated customer complaints about processing inconsistencies with the screening devices. After some research and investigation, Beloit identified the screenplate design as the primary source of the slurry stock processing problem and incorporated this information into its product specification. Subsequently, Ahlstrom was able to produce screenplates that greatly enhanced the performance of the device.[1]

On October 23, 1989, Beloit filed a patent application in the U.S. Patent and Trademark Office for the new screenplate design. Later that year, Beloit also filed various corresponding foreign applications claiming priority pursuant to the Paris Convention. In mid–1991, Ahlstrom learned of Beloit's pending U.S. patent application through publication of Beloit's European application. Concerned that Beloit had applied for a patent that would cover the Ahlstrom screenplate, Ahlstrom requested a meeting with Beloit's management. At the meeting subsequently held on December 12, 1991 at Beloit's plant in Pittsfield, Massachusetts, Simo Jutilo, Ahlstrom's General Manager, Frey Frejborg ("Frejborg"), Ahlstrom's R & D Director, and Robert Vanderhye ("Vanderhye"), Ahlstrom's counsel, sought reassurance from Beloit that Beloit had no plans to sue Ahlstrom for infringement once Beloit's screenplate patent issued. On behalf of Beloit, William Carty ("Carty"), Beloit's Manager, and Raymond Campbell ("Campbell"), Beloit's counsel, informed Ahlstrom's representatives that Beloit had no such intention.

Thereafter, Beloit's screenplate patent issued on June 11, 1996, as United States Patent No. 5,524,770 (the '770 patent). This patent covers the screenplate design issued to defendant, Beloit Technologies, Inc., a wholly-owned subsidiary of Beloit. Soon after the issuance of the '770 patent, CAE,

Ahlstrom's successor in interest, requested another meeting with Beloit's management. This meeting was held on August 16, 1996 at CAE's facility in Glen Falls, New York. In the course of this meeting, Frejborg and Richard G. Besha, an attorney for CAE, argued that Beloit's patent was invalid chiefly because Ahlstrom had manufactured and sold screenplates embodying the patented design more than one year prior to Beloit's patent application. In response, Carty and Campbell reiterated Beloit's intention not to sue CAE for infringement of the patent.

Following the August 1996 meeting, the parties' counsel exchanged a series of letters. The chronology of this correspondence and the filing of the suit is as follows:

1. On September 13, 1996, Vanderhye sent Campbell a letter reiterating CAE's belief that Beloit had previously threatened to sue it for infringement of the '770 patent and requesting Beloit's agreement to grant CAE either: (1) a worldwide non-exclusive royalty-free license; or (2) worldwide immunity from suit under the '770 patent. Vanderhye also wrote that "since Mr. Carty has already stated twice verbally that Beloit would never sue CAE for its 'infringement' we see no reason why you can't at least provide (2)." The letter set September 20, 1996 as the deadline for Beloit to respond.

2. On September 16, 1996, Campbell responded to Vanderhye's letter of September 13. Specifically, Campbell repudiated Vanderhye's claim that Beloit had threatened to sue CAE for infringement, stating that Beloit had made no allegations of patent infringement, had filed no lawsuit to that effect, and had met with CAE only at CAE's express request. In addition to noting that Beloit had not completed its consideration of CAE's prior demands, Campbell then requested CAE's agreement that: "(1) Screen baskets recently sold by CAE are covered by the claims of the '770 patent. (2) CAE continues to offer and sell screen baskets which it be-

---

1. In 1992, plaintiff, CAE Screenplates, Inc. ("CAE"), acquired Ahlstrom's screenplate division and sold the improved part to Beloit and

Beloit's direct competitors under the trademark PROFILE.

lieves are covered by the claims of the '770 patent."

3. On September 17, 1996, Vanderhye sent a facsimile letter to Campbell that provided the information requested by Campbell's September 16 letter. Specifically, Vanderhye wrote that: "[a]t least some of the claims of the '770 patent read on all of [CAE's screenplates] (that is those sold to Beloit in 1984 and 1985, and some of those recently sold by CAE and being offered by CAE now)." In addition, Vanderhye again accused Beloit of threatening to sue CAE for patent infringement, even though only a day earlier Campbell, on behalf of Beloit, had denied that Beloit intended to sue CAE for infringement.[2]

4. On September 18, 1996, CAE filed this instant action, but significantly elected to delay service of the complaint on Beloit.

5. On September 23, 1996, Vanderhye sent a letter to Campbell demanding a formal response to CAE's prior demands by September 27, 1996. In the absence of a response, Vanderhye warned Beloit that CAE "will assume that you are not interested in amicably resolving this matter." Beloit was not told that a suit had already been filed.

6. On September 24, 1996, Paul Donovan ("Donovan"), a Beloit patent attorney, informed Vanderhye by letter that Campbell was in Europe and could not handle the matter until his return.

7. On September 25, 1996, Vanderhye responded by letter to Donovan's message by indicating that CAE could wait until September 30, 1996 for Beloit's formal re-

sponse. Again, the existence of the suit was not disclosed.

8. On October 2, 1996, Vanderhye notified Campbell by letter that CAE had previously filed suit and that CAE would serve the complaint in the near future. Vanderhye concluded his letter by writing that: "We are still interested in amicably resolving this matter but if we do not receive a sincere expression of doing so in the near future we will proceed vigorously with this litigation."

On December 13, 1996, this matter came before the Court on: (i) defendant's motion to dismiss for lack of subject matter jurisdiction; (ii) defendant's motion for a protective order staying discovery pending resolution of the motion to dismiss; (iii) plaintiff's motion to compel; and (iv) plaintiff's motion to vacate the hearing on defendant's motion to dismiss. After oral argument, the motions were taken under advisement, and the parties were directed to submit supplemental memoranda on the jurisdictional issues. *CAE Screenplates Inc. v. Beloit Corporation*, CA. No. 1304–A (Order, December 13, 1996). The parties complied and the matter is now ripe for disposition without further argument.[3]

## II

The Declaratory Judgment Act, 28 U.S.C. § 2201,[4] permits federal courts to issue declaratory judgments only in cases of "actual controversy." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).[5] "In general,

2. According to Vanderhye's facsimile of September 17, 1996:

Your letter of September 16, 1996 says CAE is not under a threat of infringement. If so, why has Mr. Carty seen fit to say to CAE twice that Beloit would not sue CAE or its customers—clearly Beloit believes that it has a cause of action against CAE because it considers there to be infringement, otherwise there would be no need for Mr. Carty's assurances.

3. By Order dated February 14, 1997, the Court stayed all current proceedings in this instant action pending further Order. *CAE Screenplates v. Beloit Corp.*, 957 F.Supp. 784 (1997). Effectively, then, defendant's motion for a protective

order has been granted and plaintiff's motion to compel has been denied.

4. The Declaratory Judgment Act provides, in pertinent part, that:

In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

5. The Article III requirement that federal courts are competent only to consider actual "cases"

the presence of an 'actual controversy' within the meaning of the statute depends on 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' "[6] The declaratory judgment plaintiff bears the burden of establishing by a preponderance of the evidence that an actual controversy existed not only at the time of the compliant's filing but also throughout the pendency of the suit.[7] Thus, "[w]here the defendant raises factual questions concerning jurisdiction, the court need not accept the allegations of the complaint as true ... [but] may look behind the complaint and view the evidence to determine whether a controversy in fact exists."[8] But even "[w]hen there is an actual controversy and

thus jurisdiction, the exercise of that jurisdiction is discretionary."[9]

The test for determining the existence of an actual case or controversy in a declaratory judgment action involving patents contains two separate and distinct prongs.[10] First, defendant's conduct must have created a reasonable apprehension on the plaintiff's part that it will face a suit for patent infringement. This prong is an objective one, focusing on whether the patentee's conduct "rose to a level sufficient to indicate an intent to enforce its patent."[11] To assess the patentee's conduct, the court looks initially for a specific and express charge of infringement and, if none is found, then to the "totality of the circumstances."[12] In other words, even when no single action or statement by the patentee would suffice to put a declaratory judgment plaintiff in reasonable apprehension, the cumulative effect of the patentee's

and "controversies" arising under the Constitution and laws of the United States prohibits the issuance of mere advisory opinions. *See generally, Hayburn's Case*, 2 Dall. (2 U.S.) 408, 1 L.Ed. 436 (1792); *Rescue Army v. Municipal Court of City of Los Angeles*, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

**6.** *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 810 (Fed.Cir.1996) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)), *cert. denied,* —— U.S. ——, 117 S.Ct. 789, 136 L.Ed.2d 730 (1997).

**7.** *See, e.g., Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 635 (Fed.Cir.) (holding that "the District Court properly considered post-filing events in its evaluation of continuing jurisdiction" because "the exercise of judicial power under Article III depends at all times on the existence of a case or controversy"), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); *International Medical Prosthetics Research Assocs., Inc. v. Gore Enter. Holdings, Inc.*, 787 F.2d 572, 575 (Fed.Cir.1986) ("The burden is on [plaintiff] to establish that jurisdiction over its declaratory judgment action existed at, and has continued since, the time the complaint was filed."); *United Sweetener USA, Inc. v. The Nutrasweet Co.*, 760 F.Supp. 400, 19 U.S.P.Q.2d 1561, 1564 (D.Del.1991) (concluding "that the establishment of declaratory judgement jurisdiction at the time a complaint is filed by a potential infringer does not necessarily 'sustain the case or controversy requirement to the conclusion of that action' ") (citation omitted).

**8.** *International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir.1980); *see also, BASF*

*Corp. v. PPG Industries, Inc.*, 1991 WL 354884, 23 U.S.P.Q.2d 1193, 1198 (D.N.J.1991).

**9.** *Spectronics Corp.*, 940 F.2d at 634; *see also, Cygnus Therapeutics Systems v. ALZA Corp.*, 92 F.3d 1153, 1158–59 (Fed.Cir.1996); *Serco Servs. Co., L.P. v. Kelley Co. Inc.*, 51 F.3d 1037, 1039 (Fed.Cir.1995); *Minnesota Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672 (Fed.Cir.1991).

**10.** *See, e.g., BP Chemicals, Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed.Cir.1993); *Spectronics Corp.*, 940 F.2d at 634; *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 955 (Fed.Cir.1987); *Indium Corp. Of Am. v. Semi–Alloys, Inc.*, 781 F.2d 879, 882–83 (Fed.Cir. 1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986); *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1398–99 (Fed.Cir. 1984); *Davox Corp. v. Digital Sys. Int'l, Inc.*, 846 F.Supp. 144, 26 U.S.P.Q.2d 1231, 1233 (D.Mass. 1993).

**11.** *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed.Cir.1992); *see also, Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053–54 (Fed.Cir.1995); *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed.Cir.1988).

**12.** *See, e.g., Shell Oil Co.*, 970 F.2d at 888 ("We must look for any express charges of infringement, and if none, then to the 'totality of the circumstances'."); *Arrowhead Indus. Water, Inc.*, 846 F.2d at 736 ("When the defendant's conduct, including its statements, falls short of an express charge, one must consider the 'totality of the circumstances.' ").

actions and statements might rise to a "level sufficient to indicate an intent to enforce" the patent.[13]

Second, plaintiff must have engaged in allegedly infringing acts or possess the capability and definite intention to engage immediately in such acts. Put another way, "plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity." [14] This second prong, in essence, prohibits declaratory judgment plaintiffs from seeking advisory opinions on their potential liability for initiating some future activities.[15]

### A

■ In its motion to dismiss, Beloit contends that no actual case or controversy exists here under the Declaratory Judgment Act because CAE did not have the requisite objective, reasonable apprehension of an infringement suit when it filed its declaratory judgment complaint. CAE counters that it is entitled to discover all pertinent facts that support its jurisdictional allegations before substantively responding to Beloit's motion. Thus, the threshold question in this action is whether facts unknown to plaintiff at the time it filed the challenged complaint may be considered as evidence of plaintiff's objective, reasonable apprehension.

■ To date, no court has squarely decided this precise question, although courts have addressed a related question, namely whether events occurring *subsequent* to the complaint's filing are relevant to establishing reasonable apprehension. Unanimously, the answer to the latter question has been a resounding "no." [16] This sensible result follows from the fact that a declaratory plaintiff's objective, reasonable apprehension at the time of filing cannot be based on events that had not yet occurred.[17] The same result for the same reason should obtain where, as here, a declaratory plaintiff seeks discovery from patentee of pre-filing facts it was unaware of to buttress its claim of jurisdiction. Like events that occur after the filing of the declaratory judgment suit, defendant's pre-filing actions and statements about which plaintiff had no actual knowledge do not bear on plaintiff's state of mind for the purpose of determining objective, reasonable apprehension.[18] Thus, *all* facts learned by plaintiff

**13.** *See supra* note 11.

**14.** *Arrowhead Indus. Water, Inc.*, 846 F.2d at 736; *see also*, *Indium Corp. Of Am.*, 781 F.2d at 883; *Jervis B. Webb Co.*, 742 F.2d at 1399.

**15.** Since CAE has previously acknowledged that its activities are covered by the '770 patent, the second prong is not at issue here.

**16.** *See, e.g.*, *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1297 (Fed.Cir. 1992) (holding that "because this court examines [plaintiff's] declaratory judgment action at the time of its filing, [defendant's] subsequent action is irrelevant"); *Spectronics Corp.*, 940 F.2d at 634–35 ("We agree wholeheartedly that in personam and subject matter jurisdictional facts must be pleaded and proved when challenged, and that later events may not create jurisdiction where none existed at the time of filing."); *Arrowhead Indus. Water, Inc.*, 846 F.2d at 734 n. 2 (disregarding defendant's letter to plaintiff's customer from the analysis because "the presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed"); *International Medical Prosthetics Research Assocs., Inc.*, 787 F.2d at 576 n. 8 ("The basis for jurisdiction, i.e., facts showing a justiciable controversy, and notice of the case to be tried, should be found in the complaint."); *Performance Abatement Servs., Inc. v. GPAC, Inc.*, 733 F.Supp. 1015, 1019 (W.D.N.C. 1990) (prohibiting plaintiff from justifying its claimed reasonable apprehension on, among other things, defendant's "institution of a patent infringement suit two weeks after [plaintiff] filed its action").

**17.** The fullest exposition on this rationale was provided by the district court in *Performance Abatement Servs., Inc.* There, in refusing to consider numerous post-filing events, the court explained that:

> [It] does not put great weight on any of these other [post-filing] factors primarily because [plaintiff] has produced no evidence establishing that it actually knew of these other factors when it filed its declaratory judgment action. The Court believes that [plaintiff] cannot attempt to justify its claimed apprehension on factors that occurred after [plaintiff] filed this action.

*Performance Abatement Servs., Inc.* 733 F.Supp. at 1019.

**18.** The plain meaning of the word "apprehension" also supports this conclusion. According to a standard dictionary definition, apprehension "is an active state of fear, usually of some danger or misfortune." RANDOM HOUSE COLLEGE DICTIONARY

subsequent to the commencement of the declaratory judgment suit should be accorded no weight in the jurisdictional calculus, irrespective of whether they arose after or before the suit.[19]

For the foregoing reasons, plaintiff's motion to compel discovery must be denied and defendant's motion for protective order must be granted.

## B

■ In the alternative, CAE contends that the factual record at the time of filing, unsupplemented by any discovery, supports plaintiff's objective, reasonable apprehension and that, as a consequence, jurisdiction should be deemed proper in the circumstances. Specifically, CAE relies upon three separate factual bases: (1) the extensive series of letters between the parties' counsel concerning CAE's demands for a non-exclusive, royalty-free license and/or worldwide immunity from suit; (2) the declaration of Frey Frejborg, CAE's North American R & D Director, regarding the fears of CAE's customers (and, incidentally, Beloit's competitors) about Beloit's '770 patent; and (3) Beloit's history of patent, and related technology, litigation. Beloit responds that none of these three factors justify an objective, reasonable apprehension of a suit by defendant for infringement.

First, CAE contends that Beloit's written communications contained express threats of

infringement. Fairly read, the letters do not support CAE's position and, indeed, they even appear to contradict it. Thus, the parties' correspondence reveals that CAE, not Beloit, had initiated the discussions and demanded resolution. Nowhere in these communications did Beloit express the opinion that CAE was infringing, much less issue an express threat of suit. Ironically, the parties' letters suggest that the actual participant under reasonable apprehension of suit was Beloit, not CAE. Put another way, CAE was in the driver's seat from the outset, first attempting to goad Beloit into issuing a threat and then filing suit surreptitiously while discussions were still underway. In sum, CAE initiated the correspondence; CAE demanded that Beloit unilaterally surrender valuable property rights in the '770 patent; CAE requested Beloit's immediate agreement; CAE filed suit; and CAE terminated the parties' discussions. The unavoidable inference from these facts is that CAE orchestrated the parties' contacts to ensure that CAE would have its choice of a forum for the suit that it (not Beloit) envisioned.

In any event, the written exchanges amount to licensing negotiations, notwithstanding plaintiff's contention that they were not.[20] And it is well-settled that positions adopted by a declaratory judgment defendant during on-going licensing negotiations cannot be used to support plaintiff's objective, reasonable apprehension.[21] The case of

(1988). In light of that meaning, it is impossible for a declaratory judgment plaintiff to be apprehensive about matters outside its knowledge. Put another way, plaintiff cannot be in an active state of fear at the time of filing about circumstances of which it is unaware.

19. Plaintiff's reliance on numerous non-patent cases in which the federal courts permitted discovery of additional facts to support jurisdiction are quite beside the point. See, e.g., Thigpen v. United States, 800 F.2d 393, 397 (4th Cir.1986); Sames v. Gable, 732 F.2d 49, 51, 52 (3rd Cir. 1984); Handi Inv. Co. v. Mobil Oil Corp., 550 F.2d 543, 546, 547 (9th Cir.1977); Equal Employment Opportunity Commission v. Alford, 142 F.R.D. 283, 286 (E.D.Va.1992). In none of those cases did the dispositive jurisdictional inquiry turn on plaintiff's state of mind at the time of filing the suit.

20. In its supplemental brief in opposition to Beloit's motion to dismiss, CAE vigorously contends that the parties were not engaged in an

actual license negotiation under the '770 patent. Specifically, CAE claims that its letters to Beloit were nothing more than plain ultimatums and that CAE never intended to engage in negotiations for a royalty-bearing license. No reasonable trier of fact could accept this characterization of the parties' discussion. The written exchanges between CAE and Beloit constituted an ongoing negotiation, irrespective of whether CAE sought from Beloit a royalty-bearing license, a royalty-free license, or immunity from suit.

21. See, e.g., Phillips Plastics Corp., 57 F.3d at 1053 (holding that "[w]hen there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down"); Shell Oil Co., 970 F.2d at 888 (ruling that defendant's "statement that [plaintiff's] activities 'fall within' [defendant's] claims in the context of the parties' licensing negotiations can hardly be considered an express charge of infringement").

*Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed.Cir.1992), is particularly instructive on this point. There, as here, the declaratory judgment plaintiff initiated discussions with the patentee, who had, until then, issued no threats, taken no action, and made no threatening gestures whatever concerning enforcement of the patent. The Federal Circuit, in discounting defendant's indirectly threatening statements during the parties' subsequent negotiation, concluded that such language merely constituted "jawboning" and that it would be unfair to use defendant's posturing in response to plaintiff's provocation to create subject matter jurisdiction.[22] The same reasoning and result obtain here. Although CAE points to Beloit's letter of September 17, 1996 requesting CAE's agreement that CAE's screenplates were covered by the '770 patent as evidence of reasonable apprehension, Beloit's inquiry was simply responsive to CAE's demands for immunity from suit or a royalty-free license. Thus, Beloit's participation in negotiations with CAE constituted protected commercial activity and its letters merely reflected its position relative to CAE's demands. Under the authority of *Shell Oil*, therefore, none of Beloit's statements give rise to objective, reasonable apprehension.

Second, CAE argues that Frejborg's declaration concerning the unease and distress of CAE's customers about Beloit's '770 patent provides support for its objective, reasonable apprehension.[23] Although Frejborg mentions the discomfort and fear of CAE's customers, he neglects to identify a single action, express threat, or communication by Beloit directed to any of CAE's customers or any other third party. The only Beloit action identified by CAE that caused this customer unease was Beloit's act of applying for the '770 patent. Thus, it appears that the apprehension of CAE's customers is predicated solely on the mere existence of the '770 patent. Such an apprehension is insufficient to create a justiciable controversy, for it is well-settled that the mere existence of an adversely held patent does not create objective, reasonable apprehension of suit.[24]

Beyond this, Frejborg claims that Beloit's rejection of CAE's demands caused him apprehension that "Beloit will, when convenient to it, seek commercial benefits by threatening to sue CAE and/or its other customers." This argument also fails. CAE's counsel in his letter of September 17, 1996 admits that Beloit had reassured CAE on two occasions that it had no plans to sue CAE or its customers. And, in any event, objective, reasonable apprehension cannot be based upon the patentee's failure to provide binding and absolute reassurances.[25] In other words, Beloit's refusal to acquiesce immediately to CAE's demands for immunity and a royalty-

22. According to the Federal Circuit:

We will not encourage litigation by finding a threat to sue only because a non-threatening party, when approached by a possible infringer, asserted its best arguments in discussions. [Defendant's] statements to [plaintiff], in the context in which they arose, were not threats to sue. They were responses, characterizations, and arguments arising from discussions [plaintiff] initiated.

*Shell Oil Co.*, 970 F.2d at 889.

23. In his declaration, Frejborg avers that "at the time this suit was filed CAE's customers were becoming apprehensive about the market situation in view of the '770 patent, and were confused about whether CAE still had the right to market PROFILE cylinders to them."

24. *See, e.g., BP Chemicals Ltd.*, 4 F.3d at 980–81 (concluding that while plaintiff's "interest as patent licensor may be adversely affected by [defendant's] competitive activity, if the latter does not

constitute a threat to sue [plaintiff's] potential licensees, then [plaintiff] can not bring a declaratory judgment action against [defendant]"); *International Medical Prosthetics Research Assocs., Inc.*, 787 F.2d at 576 (holding that a patent's existence "does not alone create a right to challenge its validity in court").

25. *See, e.g., BP Chemicals Ltd.*, 4 F.3d at 980 (holding that "a patentee's refusal to give assurances that it will not enforce its patent ... is not dispositive"); *International Harvester Co.*, 623 F.2d at 1214 (finding "no case in which a plaintiff demanded patent clearance from a competitor and was able to rely upon the refusal to grant it as a basis for its reasonable apprehension"); *Viking Injector Co., Inc. v. Chemtron, Inc.*, 1993 WL 625543, 29 U.S.P.Q.2d 1547, 1548 (M.D.Pa. 1993) (stating that "[e]ven in the absence of satisfactory assurances not to sue, plaintiff must still demonstrate an objectively reasonable apprehension of suit; thus, this factor alone does not establish the existence of a case or controversy").

free license does not create a justiciable controversy.

Finally, CAE claims that Beloit's history of aggressive patent litigation caused it reasonable apprehension. In support, CAE cites eleven intellectual property cases in which Beloit has been involved.[26] Of these cases, which span a period of twenty-seven years, Beloit was plaintiff in four patent infringement actions, a declaratory judgment plaintiff in one patent suit, a defendant and counterclaimant in two patent suits, and a declaratory judgment plaintiff in one copyright case. None of these cases involved either CAE or Alhstrom.[27] Prior litigation against parties unconnected to the declaratory judgment plaintiff, standing alone, cannot precipitate an actual controversy.[28] The fact that Beloit has filed five unrelated patent actions against some of CAE's customers within the past twenty-seven years is far too remote to support a claim of reasonable apprehension of suit.

In sum, the facts known to CAE at the time the suit was filed did not give it an objective, "reasonable apprehension" that an infringement suit was imminent. To hold otherwise would allow CAE to orchestrate events to create subject matter jurisdiction

with an eye toward usurping the choice of forum.

Accordingly, defendant's motion to dismiss for lack of subject matter jurisdiction must be granted and this declaratory judgment action dismissed.

An appropriate Order will issue.

26. CAE claims that Beloit has been involved as a party in twenty intellectual property cases since 1969. Yet, a careful examination of those cases reveals that CAE erroneously counted separately each of multiple opinions in the same case. The cases include the following: *Sunds Defibrator AB v. Beloit Corp.*, 930 F.2d 564 (7th Cir.1991) (Beloit as defendant); *Beloit Corp. v. J.M. Voith*, 802 F.2d 471 (Fed.Cir.1986) (Beloit as plaintiff); *Beloit Corp. v. Valmet OY*, 742 F.2d 1421 (Fed.Cir.) (Beloit as ITC petitioner), *cert. denied*, 472 U.S. 1009, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985); *Aktiebolaget Karlstads Mekaniska Werkstad v. United States Int'l Trade Comm. and Beloit Corp.*, 705 F.2d 1565 (Fed.Cir.1983) (Beloit as ITC petitioner); *Beloit Corp. v. C3 Datatec, Inc.*, 1995 WL 674602, 1995 U.S. Dist. LEXIS 16685 (E.D.Wis. 1995) (Beloit as declaratory judgment plaintiff); *Valmet Paper Mach. v. Beloit Corp.*, 895 F.Supp. 1158 (W.D.Wis.1995) (Beloit as defendant/counterclaimant), *rev'd*, 105 F.3d 1409 (Fed.Cir.1997); *J.M. Voith, GmbH v. Beloit Corp.*, 1995 U.S. Dist. LEXIS 16908 (W.D.Wis.1995) (Beloit as defendant); *Voith v. Beloit Corp.*, 1995 WL 686473, 1995 U.S. Dist. LEXIS 19797 (W.D.Wis.1995) (Beloit as declaratory judgment defendant/counterclaimant); *Beloit Corp. v. J.M. Voith, GmbH*, 1993 WL 592530, 1993 U.S. Dist. LEXIS 20204 (W.D.Wis.1993) (Beloit as plaintiff); *Lakeside*

*Eng. Corp. v. Kusters*, 1969 Trade Cas. (CCH) P72, 783 (S.D.N.Y.1969) (Beloit as declaratory judgment plaintiff).

27. Ahlstrom's opposition to Beloit's European patent represents the only litigation between CAE and Beloit and, because Ahlstrom initiated this proceeding, it is of no help to CAE in the circumstances.

28. *See, e.g., Indium Corp. Of Am.*, 781 F.2d at 883 ("The prior patent litigation initiated by [defendant] against two other parties unconnected with [plaintiff], was too remote to make [plaintiff's] apprehension of further litigation in 1982 reasonable, insofar as necessary to give standing to bring a declaratory action on that basis."); *Premo Pharmaceutical Laboratories, Inc. v. Pfizer Pharmaceuticals, Inc.*, 465 F.Supp. 1281, 1283–84 (S.D.N.Y.1979) ("Even assuming with [plaintiff] that [defendant] has been a litigious plaintiff, its record in past suits does not by itself show that it has charged infringement of the patents challenged in this suit. At most a record of infringement suits by itself shows that the defendant may precipitate an actual controversy sometime in the future, not that it has done so already.").