ION BEAM APPLICATIONS S.A., Griffith Micro Science International, Inc., Radiation Dynamics, Inc., and Sterigenics International, Inc., Plaintiffs,

v.

The TITAN CORPORATION, and Titan Scan Corporation, Defendants.

No. 2:00CV14.

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 26, 2000.

Conrad Moss Shumadine, Willcox & Savage, Norfolk, VA, Philippe M. Bruno,

Aldo Noto, Dorsey & Whitney LLP, Washington, DC, for plaintiff.

Stanley G. Barr, Jr., Kaufman & Canoles, Norfolk, VA, Stephen Edward Noona, Kaufman & Canoles, PC, Norfolk, VA, E. Anthony Figg, Celine Jiminez Crowson, Rothwell, Figg, Ernst & Kurz, P.C., Washington, DC, for defendants.

### ORDER AND OPINION

FRIEDMAN, District Judge.

The plaintiffs in this case seek a declaratory judgment of invalidity and noninfringement regarding the defendants' patent, No. 5,396,074 for "Irradiation System Utilizing Conveyor Transformed Article Carriers" (issued March 7, 1995), and a claim under the common law for unfair competition. The complaint in this case was filed on January 6, 2000, in Alexandria, Virginia.[1] The primary plaintiff, Ion Beam Applications (IBA), is a Belgium corporation with its primary place of business in Belgium. The plaintiffs, Griffith Micro Science International, Inc. and SteriGenics International, Inc., are wholly-owned subsidiaries of IBA and are incorporated in Delaware with primary places of business in Illinois. SteriGenics also operates businesses in California. Radiation Dynamics, Inc. is also a subsidiary of IBA, and is incorporated in New York, with its place of business in New York.

IBA was founded in 1986 and works with particle acceleration systems. *See* Affidavit of Arnold Herrer, IBA Product Manager. In particular, IBA works in industrial sterilization/ionization, medical imaging and cancer radiotherapy. Since acquiring Griffith, SteriGenics and Radiation Dynamics, IBA has started focusing on food treatment. *See* Herrer Affidavit.

The use of the irradiation treatment in the food processing industry is the subject of the perceived dispute between IBA and the defendants.

The defendant Titan Corporation's primary place of business is in San Diego, California, and it is incorporated in Delaware. The defendant Titan Scan is a wholly-owned subsidiary of Titan Corporation (collectively referred to as Titan), and also has its primary place of business in San Diego, California. *See* Declaration of John Allen, Vice President of Titan Scan. Titan has offices in Northern Virginia (Alexandria and Reston). However, the functions of the Virginia offices are unrelated to the subject matter of this litigation. *See* Declaration of John Allen, Titan Vice President (dated Feb. 24, 2000) (attached to Defs' Memorandum). The defendants' alleged patent is for an "Irradiation System Utilizing Conveyor Transformed Article Carriers," and was issued by the Patent Office on March 7, 1995.

Apparently like Titan, IBA has recently become involved in the manufacture, sale and use of irradiation systems in the United States due to its acquisitions of the subsidiaries listed above. According to the allegations in the complaint, Titan has informed IBA of its contention that IBA is infringing on its patent. Amd. Complaint at ¶ 11. Based on information received from a third party, BetaBeam, IBA believes that Titan intends to file suit for infringement when IBA opens a manufacturing plant in New Jersey in or around February 2001. Amd. Complaint at ¶ 12. Additionally, IBA claims that Titan has threatened IBA's potential customers with infringement suits if they use IBA's product. *See* Amended Complaint pp. 1–3.

---

1. In this District, there is a rotating system for all patent cases between the three Divisions of the Court, and therefore, cases are not necessarily heard where they are originally filed.

Rather than answering the complaint, Titan moved pursuant to Rule 12 for dismissal of the case or for transfer to the Southern District of California. IBA responded to the motions, and then, filed an amended complaint. Both motions were set for hearing. As the Court noted on the record at the hearing, the motion to dismiss was effectively mooted by the plaintiffs' amended complaint; neither party opposed the Court's interpretation of the status of the motion to dismiss, and instead the parties argued the motion to transfer. The Court took the motion to transfer under advisement. Almost immediately after the Court heard the motion to transfer, the defendants filed a second (renewed) motion to dismiss relying on the argument set forth in its memorandum in support of its first motion to dismiss. Titan did not specifically ask the Court to withhold ruling on the motion to transfer until ruling on the motion to dismiss pursuant to Rule 12(b)(1) which is based on Titan's position that the Court lacks subject matter jurisdiction based on the absence of an actual controversy between the parties. However, the Court wrote the parties notifying them that it would withhold ruling on the motion to transfer until it decided the motion to dismiss, which raises jurisdictional arguments. The motion to dismiss is now fully briefed and argument is unnecessary. Therefore, this Opinion addresses both the motion to dismiss, and to the extent necessary, the motion to transfer.

### ANALYSIS

**I. Titan's Motion to Dismiss**

The defendants argue that the Court lacks subject matter jurisdiction and that the plaintiffs' claims should be dismissed pursuant to Federal Rule Civil Procedure 12(b)(1). Specifically, the defendants contend that the facts alleged by the plaintiff do not support a justiciable case and controversy for the Court to consider. The defendants originally argued this basis for a motion to dismiss as to the original complaint, and then after the complaint was amended, the defendants moved to dismiss the amended complaint relying solely on its previous argument. Docket Number 17 (motion to dismiss amended complaint). More specifically, Titan argues that an actual controversy does not exist between the parties sufficient to place this matter within the Court's jurisdiction.

The standard for judging whether a complaint states a justiciable controversy pursuant to the Declaratory Judgement Act for an action of patent non-infringement or invalidity is a two-part test requiring (1) that the patentee create a reasonable apprehension on the part of the plaintiff that the patentee will initiate suit of the allegedly infringing activity if it continues, and (2) that the plaintiff bringing an action for a declaratory judgment of non-infringement or invalidity produce or be in the process of producing an infringing product. *See Fina Research v. Baroid Ltd.*, 141 F.3d 1479 (Fed.Cir.1998) (utilizing two-part test to determine jurisdiction) (citations omitted); *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 810 (Fed.Cir.1996), *cert. denied*, 519 U.S. 1101, 117 S.Ct. 789, 136 L.Ed.2d 730 (1997); *BP Chem. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed.Cir.1993) (using two-part test).

Titan argues that neither of these two factors are met in this case. First, Titan argues that the plaintiffs failed to adequately allege that it has engaged in conduct subject to a charge of patent infringement or that it has made meaningful preparation to do so. Second, Titan argues that it has not threatened the plaintiffs with an action for patent infringement. Finally, Titan argues that because the Court lacks subject matter jurisdiction

over IBA's patent claims, it should not exercise jurisdiction over the pendent and supplemental claim of unfair competition. Each of Titan's arguments is addressed below in light of the allegations contained in the Amended Complaint filed by IBA.

### A. Apprehension of Suit

First, Titan argues that it has not threatened IBA with suit subject to its alleged patent. Titan is correct that its willingness and capacity, as an alleged patent holder, to enforce its patent rights is directly pertinent to the Court's inquiry as to whether an actual controversy exists in this case. *See West Interactive Corp. v. First Data Resources, Inc.,* 972 F.2d 1295, 1297 (Fed.Cir.1992) (dismissing suit for lack of case and controversy absent reasonable fear of patent infringement suit); *see also Bausch & Lomb, Inc. v. CIBA Corp.,* 39 F.Supp.2d 271, (W.D.N.Y.1999) (finding no reasonable apprehension of suit).

Determining whether a plaintiff has a reasonable apprehension of suit is an objective inquiry, wherein the court looks for a direct charge of infringement. Where none is found, the court looks to the totality of the circumstances. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988); *CAE Screenplates, Inc. v. Beloit Corp.,* 957 F.Supp. 784, 788 (E.D.Va.1997) (Ellis, J.) (dismissing case for lack of reasonable apprehension of suit) (citing *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888 (Fed.Cir. 1992)). Even where no single act by the patentee would put the plaintiff in fear of suit, the cumulative effects of the patentee's actions might rise to the level to indicate an "intent to enforce the patent."

*CAE,* 957 F.Supp. at 789 (citing *Shell Oil,* 970 F.2d at 888). Titan claims that IBA has no reasonable apprehension of suit in this case and that as a result, the case should be dismissed. IBA contends that while Titan may not have explicitly stated to IBA that it intended to sue IBA, it has implicitly threatened IBA through email and other written correspondence; it has advised third-parties, namely potential customers, that it intended to sue IBA; it has sued other parties producing similar products; and it has stated clearly in press releases and on its web page that it will "enforce" its patent.

■ On June 20, 2000, IBA filed a motion to supplement this case with the declaration of Pauline Pastore, Director of Irradiation Processing for the Food Safety Division of IBA (dated June 16, 2000) (hereinafter referred to as the "Second Pastore Declaration"). In the Second Pastore declaration, she explains that on June 15 and 16 she had contact with a potential customer of IBA, and that the customer advised her of communications he had with representatives of Titan wherein Titan threatened to sue IBA.[2] Titan objects to the Court's consideration of this declaration. Courts have previously considered whether events subsequent to the filing of a complaint in a non-infringement case are relevant to establishing "reasonable apprehension." As the court in *CAE* found, "the answer ... has been a resounding 'no.'" *CAE,* 957 F.Supp. at 789. Therefore, this Court must determine what the plaintiffs' state of mind was when the case was filed to determine whether the plaintiffs had a reasonable apprehension of suit. *Id.* at 789–90. Like in *CAE,* none of the facts learned by the plaintiffs subsequent to the

---

2. In Ms. Pastore's second declaration she explains that she contacted a potential client who advised her that he had previously been in contact with representatives of Titan and that the Titan representatives had told him that it intended to sue IBA for patent infringement as soon as the IBA facility opened in New Jersey.

filing of this action are accorded any weight in the "jurisdictional calculus." *Id.* For these reasons, IBA's motion to supplement the record with the Second Pastore declaration must be DENIED.

■ However, in the Amended Complaint, filed based on the original motion to dismiss, IBA clearly stated in Paragraph 12 that "Titan has indicated through third-party BetaBeam, Inc. that Titan plans on filing an infringement suit involving the '074 patent against the companies in the IBA Group, when IBA opens a facility in New Jersey." *See* Amd. Complaint at ¶ 12. The objective words and actions of the patentee always control in determining whether there is a reasonable apprehension of suit. In this case, the only direct correspondence between IBA and Titan that could be considered as threatening litigation is through written correspondence between Titan's former President and CEO, Greg Szabo, to Ahmet Cokragan, the President of IBA. *See* Ex. C (dated Nov. 1998) attached to Declaration of Pauline Pastore, Director of Irradiation Processing for Food Safety Div. of IBA (dated Mar. 14, 2000) (attached to plaintiffs' brief) (hereinafter referred to as "First Pastore Declaration"). In that email, Titan, through its president, stated

> I want you to be aware of the claims within our patents. It is important that you inform your customers if you know they [are] infringing with one of your machines.

*Id.* Almost one month later, Szabo wrote to the Vice President of Sales for IBA and explained, "I simply want [IBA] to be aware of our specific patent claims for future IBA projects." *See* Dec. 18, 1998, Letter from Titan to IBA (attached as Ex. D to First Pastore Declaration). Notably, however, Titan goes on in its letter to indicate that it "did not assume [that IBA was] a party, intentional or otherwise, to any potential infringement of [its] patents." *Id.* However, in the Court's opinion the letter at least implies that it believed otherwise—that IBA was infringing and that it would initiate action to prevent infringement.

Addressing the emails between Titan and IBA, Titan cites to cases in which the patentee wrote to the alleged infringer and specifically stated that it would not sue the alleged infringer. *See* Titan Motion to Dismiss at 12–13 (citing *Dow Chemical Co. v. Viskase Corp.*, 892 F.Supp. 991, 995 (N.D.Ill.1995) and *Viking Injector Co. v. Chemtron*, 29 U.S.P.Q.2d 1547, 1549 (M.D.Pa.1993)). Nothing before the Court in this case indicates that Titan has made any promise to or agreement with IBA that it would not sue based on the patents.

In addition to these two direct communications between IBA and a representative with decision-making authority from Titan, IBA claims that Titan has on at least two occasions communicated with customers or potential customers of IBA telling these third-parties of Titan's intent to sue IBA for patent infringement in the future. For example, IBA contends that Titan has communicated its intent to bring a patent infringement action against IBA to Tyson's Foods. *See* First Pastore Declaration. Additionally, IBA claims that one of Titan's top executives has communicated the same threats regarding IBA to BetaBeam, apparently a competitor of both IBA and Titan, in the context of negotiations of a suit brought by Titan against BetaBeam. *See* Declaration of Eric Beers, Vice President of Engineering and Technology for IBA (dated March 2000); Email from BetaBeam President, Scott Thams, to IBA (Ex. B to Beers Declaration). Notably, Titan denies that it made the exact remarks attributed to it by BetaBeam, and further argues that the comments made, if any, were made in the context of negotiations

and in confidence. *See e.g., EMC,* 89 F.3d at 812 (finding that the plaintiff had a "reasonable apprehension of suit" where threats were made in the context of negotiations). Titan argues that the comments quoted by BetaBeam's President should be considered as no more than hearsay.

Courts have consistently held that "rumors" that a patentee might sue are insufficient to give rise to an actual case and controversy. *See Bausch and Lomb,* 39 F.Supp.2d at 273. However, in this case the Court considers the threats more than mere rumors. A subjective apprehension is not sufficient without objective substance. *BP Chem.,* 4 F.3d at 979. With regard to the comments made to Tyson's Foods, in *Arrowhead,* the Federal Circuit found that a declaratory judgment action was justified and an actual controversy existed where a patentee sent a letter to a third party naming Arrowhead as a potential infringer that was sufficient to cause the third party to require Arrowhead to indemnify the third party before it would continue to buy from Arrowhead. *Arrowhead,* 846 F.2d at 737. Similarly with regard to the comments made by Titan to IBA's potential customer, Tyson Foods, the comments were at least sufficient to cause Tyson concern. Furthermore, with regard to the comments reported by Beta-Beam's President, Mr. Beers, the alleged comments were made by an executive of Titan to a competitor or potential customer of IBA. Whether in any of the instances the exact words were said as reported is not the issue at this juncture. The issue is what IBA reasonably believed based on what was explained to it; for example, what Beers explained had occurred in his meetings with the Titan executive. *See BP Chem.,* 4 F.3d at 978. Based on Beers' affidavit, the Court finds that IBA is objectively reasonable in fearing that Titan might initiate suit when the New Jersey facility opens. *Id.; Shell Oil Co.,* 970 F.2d

at 887–88; *see also, Green Keepers v. Softspikes, Inc.,* 1999 WL 387291, \*2 (E.D.Pa. 1999) (unpublished).

Similarly, IBA argues that Titan's history of suing similarly situated competitors (and potential customers) gives IBA a reasonable apprehension of suit against it in the future. Specifically, as noted above, Titan has already sued BetaBeam for infringement of its patents. *See* First Pastore Declaration and attached Complaint from *Titan v. BetaBeam,* (filed June 1999). In its opposition brief, IBA cites *Dupont Merck v. Bristol–Myers,* 62 F.3d 1397, 1401 (Fed.Cir.1995), in which the Federal Circuit held that where the defendant had a general policy of suing generic drug dealers under certain circumstances, the plaintiff (a generic drug dealer) had a "reasonable apprehension of suit sufficient to justify its patent non-infringement suit." Obviously, the facts of the *Dupont* case are distinguishable from those in this case. Neither party has alleged and this Court has no basis to believe that Titan, like Bristol Meyers, had a "policy" of suing certain companies. However, the fact that Titan has already initiated suit against a company that engages in activities very similar to those of IBA is relevant to this Court's inquiry and analysis of the totality of the circumstances. *See* First Pastore Declaration; Adams Declaration; and Herrer Declaration (all indicating that IBA's activities are similar to those of BetaBeam).

Furthermore, in a press release following the settlement of the case against BetaBeam, Titan announced,

> The intellectual properties of Titan—including issued and pending patents—are valuable assets. We are committed to protecting our shareholder's value, and we will continue to enforce our patent position against those who infringe.

*See* First Pastore Dec. ¶ 13, Ex. E (dated Jan. 26, 2000). Finally, in addition to Titan's press release regarding the BetaBeam settlement, Titan has publicly announced on its web page that "any company that attempts to create an electronic beam system to electronically pasteurize food would violate one or more of Titan's patents." *See* Ex. A to First Pastore Declaration.

Based on the facts of this case, the Court is of the opinion that the totality of the circumstances, including communications made by Titan directly to IBA, communications made by Titan to potential customers of IBA, communications made by Titan executives to other companies in a similar position as IBA, and Titan's history of litigating its patent rights with regard to another companies' activities (which appear similar to IBA's activities), all combine to create an objectively "reasonable apprehension of suit." While one of these occurrences standing alone may not have sufficed to create a reasonable apprehension of suit, the combination makes IBA's fear of litigation reasonable. As the court found in *Arrowhead,* it would be difficult in this case to imagine how a "prudent" IBA executive "could resist the onset of a most reasonable apprehension" that IBA might be sued by Titan for patent infringement. *Arrowhead,* 846 F.2d at 737.

### B. Engagement in Activities that Could Constitute Infringement

■ As to the second prong of the jurisdictional analysis in a patent noninfringement suit, such as this, the Court must determine whether IBA has properly alleged that it is engaged in activities which could constitute infringement. IBA contends that the allegations contained in Paragraph 10 of its original complaint sufficiently described its irradiation system.

Paragraph 10 of the original complaint states as follows:

10. The IBA produces for sale in the United States and is involved in the manufacture, use and sale of irradiation systems in the United States.

*See* Complaint at ¶ 10 (Jan. 6, 2000).

Without conceding that the allegations in Paragraph 10 of the original complaint were insufficient, IBA went a step further and filed an amended complaint to correct the alleged jurisdictional deficiencies. Aside from the portions of Paragraph 12 set forth above, with regard to actual activity potentially infringing, IBA alleged in Paragraphs 12 and 13 provide as follows:

12. Titan has indicated through third-party Beta Beam, Inc. that Titan plans on filing an infringement suit involving the '074 patent against the companies in the IBA Group, when IBA opens a facility in New Jersey. The IBA New Jersey facility that Titan has threatened is under construction and will be completed on or about February 1, 2001. Drawings of the facility, which are proprietary and confidential, have already been prepared and can be provided to the defendants' counsel when an appropriate confidentiality order has been entered in this action. The irradiation system to be included in the New Jersey facility and the irradiation systems the IBA Group has offered for sale, and continues to offer .for sale in the United States, include an article irradiation system utilizing a radiation source, article carriers, and multiple conveyors for transporting articles to be sterilized or pasteurized past the irradiation source.

13. Titan has threatened potential customers of the IBA Group with in-

fringement suits if such customers purchase and utilize certain systems for the pasteurization of food of IBA group in a manner that infringes the '074 Patent, which threats are impeding the sale of such IBA Group systems, thereby causing IBA Group irreparable harm.

*See* Amended Complaint at ¶¶ 12 & 13.

Furthermore, IBA contends that its December 16, 1999, press release (*see* Ex. C attached to declaration of Joseph Hynds submitted by Titan in support of its motion to dismiss), and the description in IBA's original complaint is identical to the description of the Titan product. IBA cites *Morphosys AG v. Cambridge Antibody Ltd.*, 62 F.Supp.2d 100, 102 (D.D.C.1999), for the proposition that a general description of the plaintiff's product contained in a press release was sufficient for a description of the product in a non-infringement case. However, the existence of a faxed press release to the plaintiff in *Morphosys* was not to show that the plaintiff was engaged in a potentially infringing activity, but was considered as evidence that the plaintiff had a reasonable apprehension that it might be sued by the patentee, the defendant. Therefore, the Court does not find *Morphosys* useful in the second prong of determining subject matter jurisdiction.

Instead, more compelling in the Court's inquiry is the progress of the New Jersey IBA facility. As set forth in the record of this case, IBA is by now likely well underway in the building or development of its proposed New Jersey facility, which was planned for completion by February 2001. Aside from IBA's sales activities, as documented in the record, concrete steps have been taken which show that IBA is engaged in potentially infringing activities. *See Fina*, 141 F.3d at 1485. In at least one case, a court allowed a patent to proceed over the defendant's motion to dismiss where the only activity afoot was the construction of a plant where allegedly infringing conduct would ultimately occur. *Proler Steel v. Luria Bros.*, 223 F.Supp. 87, 88–89 (S.D.Tex.1963), *on reconsideration* 225 F.Supp. 412 (S.D.Tex.1964) (declining to exercise jurisdiction for discretionary reasons even though actual case and controversy existed). Similarly in this case, the Court finds the facts (specifically the building of the New Jersey facility) compelling and that the plaintiffs are actively engaged in what could be determined to be infringing activities.

Because the plaintiffs have satisfied their burden of establishing both a reasonable apprehension of suit and the fact that they are engaged in activities which could be considered as infringing, they have met their burden of establishing subject matter jurisdiction in this Court. As a result, the defendants' motion to dismiss is DENIED.

However, the Court notes that even where jurisdiction is proper based on an actual controversy, as it has been determined in this case, exercising jurisdiction in a declaratory judgment action is within the discretion of the district court. *See Fina*, 141 F.3d at 1485–86 (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) and *Serco Servs. Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039 (Fed.Cir.1995) ("even when a case satisfies the actual controversy requirement, there is no absolute right to a declaratory judgment, for the statute specifically entrusts courts with discretion to hear declaratory suits or not depending on the circumstances")); *see also EMC Corp.*, 89 F.3d at 814 (affirming decision to decline to exercise jurisdiction even where actual controversy existed). However, because, as set forth below, the Court is of the opinion that this case should be transferred to Southern California, the decision

of whether to exercise discretion is best left to the California court.

## II. *Titan's Motion to Transfer*

Titan seeks to have this matter transferred to the Southern District of California based on the convenience of the parties pursuant to 28 U.S.C. § 1404(a). Under 28 U.S.C. § 1404, once jurisdiction and venue have been established, a district court may transfer a civil action for the convenience of the parties to any other district or division where the action might have been brought for the convenience of the parties or witnesses, or in the interest of justice. As the Supreme Court has explained, the statute providing for the transfer of venue "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964)); *see also Cognitronics Imaging Systems, Inc. v. Recognition Research, Inc.*, 83 F.Supp.2d 689, 696 (E.D.Va.2000) (Smith, J.) (recognizing discretion placed in District Court to transfer for more convenient forum).

The defendants in this case do not contend that either personal jurisdiction or venue are inappropriate in this District. Instead, the defendants contend that it would also be appropriate in the Southern District of California, and moreover, that it would more convenient and in the interest of justice to try this case in California rather than Virginia. The plaintiffs, as expected, disagree that it would be more convenient to litigate the claims in California. Therefore, the sole issue before the Court is where it will be most convenient to litigate this case and where the interest of justice will be best served. *See* 28 U.S.C. § 1391 (establishing venue rules generally).

■ Various factors are weighed in determining whether a transfer of venue is appropriate. Some of the factors a court may look to are the convenience of the parties and witnesses, where the cause of action arose, and whether there is a contractual choice of forum clause. In most cases, the plaintiff's choice of forum should be given significant weight, and should not be disturbed unless the balance is strongly in favor of transfer. *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir.1984) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). However, in a case such as this where the chosen forum is neither the defendant's nor the plaintiff's home forum, this consideration is considerably lessened. *Cognitronics*, 83 F.Supp.2d at 696 (citing *Corry v. CFM Majestic, Inc.*, 16 F.Supp.2d 660 (E.D.Va.1998)). The "interests of justice" can include "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of an unfair trial, the ability to join other parties, [and] the possibility of harassment." *GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F.Supp.2d 517 (E.D.Va. 1999) (Spencer, J.) (citations omitted).

■ In this case, the transfer of venue to the Southern District of California is appropriate based upon a careful consideration of several factors.[3] At the outset the Court notes that the evidence before

---

**3.** The defendants' motion to transfer discussed the possibility of transferring this case to either California or to Colorado, the two places where the patented product at issue was allegedly conceived. However, the focus of the defendants' motion is for transfer to Southern California, not Colorado.

the Court indicates that venue is appropriate in any number of districts of the United States District Court, including this District. The plaintiffs argue that there is no connection to this case and the defendants' requested forum of California. However, this assertion is plainly incorrect. In fact, at least three of the inventors of the patented device at issue reside in Southern California. Furthermore, the attorneys that applied for and prosecuted the "patent in suit" all reside in Southern California. Additionally, Titan operates its "article radiation business" from Southern California and its primary place of business is in San Diego, California. Presumably many of the documents necessary to prove the validity of the patent are located in California. With regard to the plaintiffs' connections to California, at least one of the plaintiffs, SteriGenics, operates in California.[4] In contrast to the witnesses potentially from California, neither the defendants nor the plaintiffs have named a specific anticipated witness that resides in Virginia. *See GTE Wireless*, 71 F.Supp.2d at 520 (transferring case where, among other things, the plaintiff did not identify one potential witness from Virginia).

Presumably to establish personal jurisdiction, the plaintiffs have noted that the defendants have at least two small offices in Northern Virginia. However, the defendants claim, and the plaintiffs have not disputed, that the Northern Virginia offices of Titan do not engage in the business of poultry or meat irradiation, the subject matter of this suit, but instead are involved in e-commerce. *See* Allen Declaration. Indeed, while the plaintiffs note that the defendants have an office in Virginia, the location of that office is not relied on by the plaintiffs as a reason for the case to remain in this District. Rather, the plaintiffs rely on more tenuous connections to Virginia which are addressed below in no particular order.

First, the plaintiffs contend that many of its witnesses are located on the "East Coast" and that it is more convenient for these witnesses to travel to Virginia than to California. Specifically, the witnesses identified to date by the plaintiffs are located in New York, New Jersey, and Tennessee. The plaintiffs' anticipated plant, which might or might not produce an infringing product, is scheduled to open in 2001 in New Jersey. At least one of the IBA subsidiaries has offices in New York. The plaintiffs claim that it would be more convenient for these witnesses to travel to Virginia, on the East Coast, than to California.[5] Additionally, the plaintiffs contend that because its headquarter offices are in Belgium, it would be more convenient for it to travel to the East Coast than to either San Diego, California or Denver, Colorado. IBA argues that transferring the case would place a burden on it to transport its documents to California, across the country. This is undoubtedly true. However, IBA already has a burden to transfer documents and witnesses to Virginia. This Court has no greater subpoena power over out-of-state witnesses

---

4. SteriGenics operates numerous irradiation facilities, five of which are in California, and one is specifically located in San Diego. *See* SteriGenics Home Page (attached as Ex. A to Defs' Motion to Transfer Reply).

5. The Court notes that based on the information provided by the plaintiffs, it appears that either New York or New Jersey would have been a more convenient forum for the plaintiffs. However, the defendants have not made a motion to move this case to New York or New Jersey, and the Court will not sua sponte move the case to either of these Districts without knowing whether the Court could establish personal jurisdiction over the defendants in either of those states.

than does the Southern District of California.

IBA compares this case to *Reynolds Metals Co. v. FMALI, Inc.*, 862 F.Supp. 1496 (E.D.Va.1994), where the court denied a motion to transfer so as to defer to the plaintiff's choice of forum and not shift the burden of litigating out-of-state to the plaintiff. However, like the other cases distinguished above, this case differs from *Reynolds*, as Virginia was the plaintiff's home forum in *Reynolds*, and the events that gave rise to the claims occurred in Virginia. Such is not the case here. The defendants dispute that it would be less convenient for IBA in Belgium to travel to California.

Second, the plaintiffs claim that they have solicited business in Virginia. Specifically, the plaintiffs assert that on at least one occasion they solicited business from a Virginia company, WLR Foods. With regard to the WLR Foods contact, the facts before the Court are that the plaintiffs might have made one sales visit to WLR. *See* First Pastore Declaration (stating that "IBA has visited WLR Foods in Virginia to present and offer for sale its irradiation system and services"). From the First Pastore Declaration it is unclear whether the sales visit was related to the patent at issue in this case. However, regardless of the subject matter of the sales call, the defendants correctly argue that sales visits alone are not sufficient to establish a connection with a forum. In *GTE Wireless*, the court transferred a case similar to this case to the Southern District of California even in light of GTE's assertions that sales visits had been made in Virginia. The court found that there were only limited calls made, and that there were calls made throughout the nation. *GTE Wireless*, 71 F.Supp.2d at 519. Certainly IBA's reference to its one communication with WLR can be described as "limited" and presum-

ably IBA and Titan are both engaged in national marketing and sales strategies.

Similarly, as set forth above, the plaintiffs claim that Tyson Foods has been threatened by the defendants with an infringement action and that IBA has made sales calls on Tyson. *See* First Pastore Declaration. Titan has thus far denied that it has threatened Tyson Foods, and it argues that the alleged threats of patent infringement are "double hearsay," and unsupported conclusions which would be inadmissible in court. *See generally Scosche Ind., Inc. v. Visor Gear, Inc.*, 121 F.3d 675, 680–81 (Fed.Cir.1997) (finding statement made in declaration regarding what plaintiff told a potential customer was hearsay and inadmissible on motion for summary judgment in patent case). Additionally, Titan notes that Tyson is headquartered in Arkansas, not Virginia, and that IBA's sales calls on Tyson were made by telephone where Tyson was located in Arkansas. Only two of Tyson's dozens of poultry plants are located in Virginia. Finally, Titan contends that if it had threatened Tyson, those events would support a conclusion that Arkansas might be an appropriate forum, not Virginia.

Third, IBA argues that its counsel are located in Washington, D.C. and locally, and the attractiveness of the Eastern District of Virginia's "rocket docket." However, while docketing considerations might be relevant to the "interests of justice," *see supra*, the convenience of counsel is not an appropriate consideration. *See Cognitronics*, 83 F.Supp.2d at 697. Furthermore, docket considerations cannot be the primary consideration. *Id.* (citations omitted); *GTE Wireless*, 71 F.Supp.2d at 520.

Fourth, IBA posits that Virginia's connection to the poultry industry justifies this suit staying in Virginia. Titan strenuously objects, and this Court agrees that the poultry industry should not determine

where the suit is best filed. As an initial matter, the Court notes from the facts before it that Virginia ranks only fifth in the country for turkey production and ninth in the country for chicken production. *See* First Pastore Declaration. Additionally, the same system used for poultry can be used in processing beef, and California has a significantly larger cattle industry than Virginia. *See* Defs' Ex. C (attached to Declaration of Celine Crowson and Defs' Reply). Therefore, even under the plaintiffs' theory, Virginia would not necessarily be the most logical choice of forum.

Finally, the plaintiffs urge the Court to give considerable weight to its choice of forum. In an ordinary case, the plaintiff's choice is indeed given great deference by the Court. However, where the plaintiff's choice of forum is a place where neither the plaintiff nor the defendant resides and where few or none of the events giving rise to the cause of action accrued, that plaintiff's choice loses its place status in the court's consideration. In *Correy,* the court transferred a case to Indiana finding that while the plaintiff's choice of forum is usually given some deference, it is "of little moment" where neither the plaintiff nor the defendant resided in Virginia. *Corry,* 16 F.Supp.2d at 666. The plaintiffs rely on *Furmanite America, Inc. v. Durango Assoc., Inc.,* 662 F.Supp. 348, 351 (E.D.Va. 1986), where the Court refused to transfer a case to Houston from Virginia. However, the facts in *Furmanite* differ from those here in that Virginia was Furmanite's home forum. Additionally, in *Furmanite,* the defendant had sent the plaintiff alleged threats of patent infringement to its place of business in Virginia. In this case, it may be more convenient to travel from New York to Virginia, rather than from New York to California. However, while the plaintiffs' home forum in the United States might be Illinois (where Griffith and SteriGenics are headquartered), New Jersey (where many of its witnesses are located and its new plant is being constructed) or New York (where Radiation Dynamics is located), it clearly is not Virginia. In truth, there is really no connection this Court is aware of between the facts in this case and Virginia.

The plaintiffs urge the Court not to create a precedent whereby when a foreign corporation brings a claim in the United States courts the matter is automatically transferred to the defendant's home forum. This Order does not create such a precedent. Rather, in any case a foreign corporation can elect to bring a case wherever jurisdiction and venue are proper, and in each case the factors outlined above will be analyzed by the reviewing court should the defendant move to transfer the case under Section 1404(a). In many cases, the foreign corporation will be able to establish a stronger nexus to its chosen forum than the plaintiffs have done in this case. For example, a forum where the events at issue occurred, where the subsidiaries of the plaintiffs' company are located, or where the plaintiffs' witnesses reside might tip the balance in favor of the plaintiffs lacking a "home forum." However, none of these factors are present in this case. While the Court agrees wholeheartedly that a plaintiff's choice of forum should rarely be disturbed, this case represents one of those rare occasions.

## CONCLUSION

For all of the reasons set forth above, IBA's motion to supplement the record with the second declaration of Pauline Pastore is hereby DENIED; the defendants' motion to dismiss is DENIED; and the defendants' motion to transfer is GRANTED, and this case is hereby TRANSFERRED to the Southern District of California for all further proceedings.

The Clerk is DIRECTED to send a copy of this Order to all counsel and to forward the entire case file to the United States District Court for the Southern District of California.

It is so ORDERED.